CAMPBELL–CRANE & ASSOCIATES,
INC., et al., Appellants,

v.

Sasha STAMENKOVIC, Appellee.

Nos. 09–CV–64, 09–CV–461.

District of Columbia Court of Appeals.

Argued March 25, 2010.

Decided May 31, 2012.

Stanley J. Reed, with whom Marc R. Engel and Michael J. Neary, Bethesda, MD, were on the brief, for appellants.

Michael J. Hoare, with whom Dennis Chong, Washington, DC, was on the brief, for appellee.

Before GLICKMAN, Associate Judge, RUIZ, Associate Judge, Retired,* and REID, Senior Judge.**

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

** Judge Reid was an Associate Judge of the

RUIZ, Associate Judge, Retired:

This appeal stems from an employment discrimination suit initiated by Sasha Stamenkovic, who was employed at Campbell–Crane & Associates, Inc. ("Campbell–Crane"), and claimed to have been sexually harassed for three years by Campbell–Crane's owner, Jeanne M. Campbell. Campbell and Campbell–Crane appeal the jury's verdict in favor of Stamenkovic on the sexual harassment claim as well as the award of $812,000 in compensatory damages and $455.739.50 in attorneys' fees and costs. Appellants argue that the trial court made instructional and evidentiary errors during trial, and that, post-trial, the court erred in denying their motion for judgment as a matter of law or for new trial challenging the jury's verdict on compensatory damages, and abused discretion in awarding attorneys' fees. Although we agree with appellants on one of these claims, that the instruction of what constitutes a "hostile" work environment was incomplete, we conclude the error was harmless. Therefore, we affirm the judgment.

## I. Statement of Facts

Appellee, Sasha Stamenkovic, filed suit against Campbell–Crane and Campbell (hereinafter sometimes referred to collectively as "Campbell–Crane" or "appellants"). Stamenkovic asserted two claims under the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 2–1402.01 *et seq.* (2001), for a hostile work environment based on sexual harassment and for retaliation, as well as a claim under the District of Columbia Wage Payment Act, D.C.Code §§ 32–1301 *et seq.* (2001). After a six-day trial, the jury returned a verdict in favor of Stamenkovic on all

claims, and awarded him $800,000 in compensatory damages for the hostile work environment claim, and $12,000 for his retaliation claim.[1] Following the trial, appellants filed a timely motion for judgment as a matter of law or for a new trial. In a brief order, the trial court denied appellants' motion without a hearing. This appeal ensued. After this appeal was filed, the trial court awarded appellee $455,739.50 in attorneys' fees and costs, which appellants also appealed. We consolidated both appeals.

### 1. *Hostile Work Environment*

*Sasha Stamenkovic's evidence at trial*

Stamenkovic, a 26–year–old immigrant from Serbia, testified at trial that he met the 69–year–old Campbell at the Washington Sports Club where he worked as a personal trainer for her and other clients. Without checking any references, consulting her colleagues, or asking appellee about his related work experience, Campbell offered Stamenkovic the position of Vice President of International and Corporate Development and Meeting Manager. Campbell also became Stamenkovic's sponsor for his H1–B work visa and his application for immigration ("green card").

According to Stamenkovic, Campbell did not make a distinction between the workplace and party-time, and immediately and repeatedly harassed him with sexual propositions and innuendo. Among the many examples Stamenkovic recounted, he testified that Campbell swam nude in her pool while the firm's employees were in attendance, and made sexually explicit comments about a former lover, about Stamenkovic, and even about his bulldog, whom she described as having "huge balls." On

---

court at the time of argument. Her status changed to Senior Judge on April 7, 2011.

1. The jury found in Stamenkovic's favor on his wage claim, but did not award any damages.

more than one occasion, Campbell told Stamenkovic in detail about her prior sexual experiences; once she demonstrated to Stamenkovic "with her hands . . . how big [a former lover's] organ [wa]s" and that their sex was enhanced with marijuana. Campbell invited Stamenkovic to sleep with her and asked him to obtain marijuana. In one of their trips together, Campbell told him that she wanted him in her room for "rough sex." On another occasion, Campbell urged oral sex, arguing with Stamenkovic that it was not a sexual act; she touched herself and made moaning noises. Stamenkovic testified about a number of other instances where Campbell in subtle and not-so-subtle ways made sexual advances and, increasingly, demands. Stamenkovic rebuffed Campbell's sexual advances.

Stamenkovic testified that Campbell also tried to control his personal life and relationships. For example, when they went to local restaurants and clubs, Campbell acted as though they were a "couple," and she made it clear to Stamenkovic that she did not want him with other women. On one occasion, when appellee showed up with a date, Campbell got upset, called his date a "slut," and ordered him to leave the event with her. Stamenkovic described at least three other instances where Campbell insulted him or his date and made it clear that she did not want him to see other women. According to Stamenkovic, she would check his cell phone and was angry when she found that he had called other women. On a trip to Ireland, Campbell said in no uncertain terms, "you are my boy, you cannot do things like that . . . you cannot be with anybody else" when she found out that Stamenkovic had "escorted" Heather Hamby (a woman they had met in Ireland) "to her hotel room" after they had all been socializing at a hotel and another club together.

Stamenkovic introduced several emails. One of them was from Campbell to Hamby, sent in October of 2004, in which Campbell stated her view of Stamenkovic vis-à-vis two other men:

Dan [Crane] is my business partner for 10 years and kind of my man. Mark's the new guy, a rocket scientist with a pony tail and Mr. Little Giant, and I adore them both. But Mark lives in Alabama so I don't see him often. . . . Sasha [Stamenkovic] is the Arm Candy. More boy than toy . . . Are you having fun with the contractors re-doing the condo? Did you say condo or condom? Love ya, Beautiful. JC

In an email sent to Stamenkovic on September 24, 2004, Campbell said:

Last time at the pool you danced with a lot of girls. I don't think you respect me as much as you did, so I think you can dance with me at this party. You are getting to be mature and have more wisdom—like the wisdom to dance with GCG—GreenCardGirl. Will see just how much of a smarty pants you really are. Is this place close enough so I won't have to drive? Dgetting browy on 1 percoset, 1 ambien. Yawn . . . jc

In a third email, this one from Stamenkovic to Campbell, dated May 5, 2005, he stated, among other things, that "you know that I want no more sexual demands, but I must work."

Stamenkovic testified that from the moment when Campbell first propositioned him at her home during his first month of employment at Campbell–Crane, Campbell's sexual comments and conduct made him "more and more agitated, more and more nervous . . . [and] very uncomfortable." His immigrant status made him vulnerable, and he felt pressured to stay at Campbell–Crane. During his three years at the firm, Campbell caused him stress when she confronted him every time they

got into an argument. He testified that he was fatigued and, at one point, became very sick. Campbell also embarrassed him repeatedly in front of his co-workers,[2] and his dates. Stamenkovic became "more and more irritated, more and more angry. [His] stomach started hurting more and more. [He] was getting more and more depressed." He also testified that he lost weight, could not sleep, and was irritable. For some time, he lost interest in having sexual relations with women. He was so depressed that in August of 2005 he decided not to marry his fiancée at that time (although he did marry her several years later).

Stamenkovic began treatment with Dr. William Lawson, Chair of Howard University's Department of Psychiatry, on August 8, 2005, three months after he filed suit. Dr. Lawson testified that he had seen Stamenkovic ten to twelve times between August of 2005 and the time of trial, in June of 2008. Dr. Lawson had initially diagnosed Stamenkovic with a "despondent disorder," but over time came to believe that he suffered from major depression and post-traumatic stress disorder ("PTSD"). He treated Stamenkovic with medication and cognitive psychotherapy. Dr. Lawson explained that appellee had an "intense fear" that Campbell–Crane would ensure that "he never worked anywhere else" and he felt "helplessness or horror" because he thought "that he was at a significant risk of being deported." Dr. Lawson testified that Stamenkovic complained that Campbell "was making sexual demands on him and that if he didn't comply with her demands that there was a possibility that he might be deported." Further, Dr. Lawson testified, Stamenkovic was "concerned about his self-percep-

tion as a man, that he would loose (sic) his sexual identity, sexual virility, because of the [sexual harassment]" by Campbell.

*Campbell–Crane's evidence at trial*

Jeanne M. Campbell testified that she began her career as a lobbyist and, over the years, built a successful lobbying firm that came to be known as Campbell–Crane & Associates, Inc. She confirmed that she met Stamenkovic at the gym, but gave a different account of how she came to employ him and of their working relationship at the firm. During the personal training sessions, Stamenkovic informed Campbell that he had a degree in business management from a prominent Serbian university, a management background in the hotel industry, and spoke several languages. He told her that he was in the United States on a work visa, which required him to maintain a sponsor. Six months later, in March of 2002, Campbell hired Stamenkovic as Campbell–Crane's Director of Meeting Management and Vice President for International and Corporate Development, and became his sponsor for immigration purposes. Stamenkovic's primary responsibility was to coordinate logistics for the numerous events that the firm arranged for Campbell–Crane's clients.

Campbell testified that Campbell–Crane had a small staff, and its employees were close and would often socialize with one another on weekends. During the three years Stamenkovic was at the firm, he joined, and often coordinated, many after-hours entertainment events at restaurants and local night clubs for his employer. He also accompanied Campbell on trips to New York, Florida, and abroad. During a trip to Ireland, he referred to Campbell as

---

2. For example, at a company-sponsored event in Newport, Rhode Island, Campbell accused Stamenkovic of trying "to fuck my employees," including, specifically, Linnsey Work-

man. Workman also testified that Campbell had "accused [her] of sleeping with [Stamenkovic]" while they were "sitting together at dinner" at the same event.

his "green card girl," as the trip to Ireland was necessary for his visa. Campbell denied all of Stamenkovic's allegations that she sexually harassed him.

Toward the end of 2004, Stamenkovic told Campbell that he was engaged in some side real estate endeavors, and that he was attempting to purchase a number of condominium units. Campbell raised Stamenkovic's salary to $45,034 after he informed her he could not qualify for refinancing because his income was too low.

According to Campbell, she and Stamenkovic had two fights, both due to his being late to pick her up for work. On the first of these occasions, Stamenkovic stormed off, announcing that he quit his job. After he apologized and sent Campbell an email, she allowed him to continue working for her. After the second incident, Stamenkovic returned to work, but he hired an attorney and filed the underlying sexual harassment suit. Although Campbell was informed of the lawsuit filed against her and the firm, she did not terminate Stamenkovic's employment until she learned at her deposition in this matter that he had tape-recorded a conversation they had had on May 12, 2005. After the close of discovery, Campbell found evidence in the firm's computer system that Stamenkovic had been operating an illegal gambling operation from the offices of Campbell–Crane during the entire time he worked there.

Several of the firm's employees—Linnsey Workman, William Marthaller, Tibor Bartalos, Rick Murphy, and Hali Jilani—testified at trial. They had varying degrees of personal and professional connections with Campbell and Stamenkovic; all testified that they never saw or heard any indications that Campbell sexually harassed Stamenkovic. He never complained to his colleagues regarding any inappropriate advances made by Campbell.

Workman, who worked closely with Stamenkovic, testified that Stamenkovic would get frustrated when Campbell criticized his work, but she stated that this criticism did not relate to any sexual harassment. Bartalos, Murphy, and Jilani described the work atmosphere at Campbell–Crane as "positive" (Bartalos), "relaxed" (Murphy), and "very pleasant" (Jilani).

### 2. Retaliation Claim

Stamenkovic filed an amended complaint on August 24, 2005, alleging Campbell fired him in retaliation for filing his original complaint in this case. The retaliation claim alleged that on May 12, 2005, the day after Stamenkovic filed the underlying suit and a copy was delivered to Campbell's office, he attended a meeting with Campbell at her office; Hali Jilani, and "Pete," a temporary employee, also sat in at the meeting. Stamenkovic testified that, at the meeting, Campbell explained that she needed him to work, and that she was "shocked" when she had been told as she came to work that morning of Stamenkovic's lawsuit for sexual harassment. Campbell called her attorney, and after receiving advice, asked Stamenkovic, "Well, do you think it is appropriate to [work] here?" to which he answered, "You are the boss." Stamenkovic never returned to work. Campbell testified that Stamenkovic was "invited" to return to work, but never did so. She also testified that she did not fire Stamenkovic because he had filed suit, but because, unbeknownst to her, he had tape-recorded their conversation on May 12, 2005.

## II. Jury Instructions

### A. "Hostile" Work Environment

■ Appellants claim that the trial court improperly instructed the jury on the required elements of a discrimination claim based on a "hostile work environ-

ment" under the DCHRA, and then compounded the error by not responding to the jury's request for a definition of the term "hostile." We agree that the trial court erred as a matter of law in its initial instruction on the sexual harassment claim and in its response to the jury's request for a definition of the term "hostile." However, in light of the instructions as a whole, the evidence presented at trial, and the jury's verdict, we conclude that the error was harmless.

The trial court and the parties engaged in an extended colloquy regarding the court's proposed jury instructions on a discrimination claim based on a "hostile work environment" resulting from sexual harassment. Each party submitted its own proposed instruction,[3] and the trial court fashioned a proposed instruction. Appellants objected to the court's proposed instruction, and specifically asked the court to include language that the sexual harassment "must result in a change of terms and conditions of employment." The court denied the request and instead gave the following instruction:

> Sexual harassment may include but is not limited to verbal harassment or abuse, subtle pressure for sexual activity, demanding sexual favors accompa-

nied by implied or overt threats concerning an individual's employment status, demanding sexual favors—demanding sexual favors accompanied by implied or overt promise of preferential treatment with regard to an individual's employment status. Rude, harsh and/or unkind conduct by an employer may not constitute sexual harassment. In order to establish the existence of a hostile work environment, the plaintiff must prove by a preponderance of the evidence that the plaintiff is a member of a protected class. Males and females are members of a protected class[.] The plaintiff has been subjected to unwelcome conduct. Unwelcome conduct is conduct which the employee did not solicit or incite and the employee regarded as undesirable or offensive[.] The harassment was based on the plaintiff's membership in the protected class. And in this case that is the plaintiff's gender[.] The harassment was so severe or pervasive that a reasonable person in the plaintiff's position would find ... the work environment to be hostile and that the defendants knew or should have known of the abusive conduct.

3. Appellants proposed the following instruction:

> The workplace environment becomes "hostile" for purposes of the law only when the offensive conduct permeates the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. In other words, the alleged sexual harassment must be so severe or pervasive that it destroyed the plaintiff's opportunity to succeed at the defendant company.

Appellee proposed the following instruction:

> Your verdict must be for Plaintiff and against Defendants on Plaintiff's claim of

sexual harassment if all of the following elements have been proved by a preponderance of the evidence: First, Plaintiff was subjected to conduct of a sexual nature such as commentaries about sex or sexual matters, or inquiries about sexual conduct, or sexual advances; Second, such conduct was unwelcome; Third, such conduct was based on Plaintiff's sex; Fourth, such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile; and Fifth, at the time such conduct occurred and as a result of such conduct, Plaintiff believed his work environment to be hostile.

On the second day of deliberations, the jury sent a note asking for a definition of the word "hostile." Appellants renewed their objection to the instruction, and proposed that the court respond to the jury's request by using "the language of *Bryant*" where the court stated:

> The workplace environment becomes "hostile" for purposes of Title VII only when the offensive conduct "permeates [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." These standards ensure that Title VII will not become a "general civility code," and are intended to filter out complaints attacking "the ordinary tribulations of the workplace such as the sporadic use of abusive language, gender-related jokes and occasional teasing."

*Bryant v. Leavitt,* 475 F.Supp.2d 15, 28 (D.D.C.2007) (alteration in original) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) and *Faragher v. Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The court refused appellants' request because it considered that the language used in *Bryant* was "in legal speak," and "the instructions [of] the court in fashioning jury instructions for this claim were very specific about not framing the instructions in legalspeak." Instead, the trial court informed the jury that "[t]he D.C. Human Rights Act does not define the word hostile by itself, so there's not a definition at this point that the Court can give you because the law has not created one for me. I can only refer you back to the jury instructions that you have already received."

After a brief recess, the trial judge informed the parties that she had re-searched the definition of "hostile," and that "[she] was not satisfied with the response that [she] gave to the jury," having found a definition of "hostile work environment" in this court's opinion in *Lively v. Flexible Packaging Association,* 830 A.2d 874 (D.C.2003), which defines "hostile" work environment in a manner similar to *Bryant.* Appellants' counsel again urged the court to define the word "hostile" for the jury, but the trial judge decided, without further explanation, against providing the definition to the jury.

■ Even though, as the trial court noted, there is no definition of "hostile work environment" in the DCHRA, the trial court was not without legal guidance. The law is clear that to establish a claim of discrimination based on a hostile work environment under the DCHRA, a plaintiff must show: "(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in a protected class, and (4) *that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.*" *Daka, Inc. v. Breiner,* 711 A.2d 86, 92 (D.C.1998) (emphasis added). Furthermore, as the trial court recognized, in *Lively,* which relied extensively on *Daka* and relevant cases from the Supreme Court, we explained that "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." 830 A.2d at 889; *see Fred A. Smith Management Co. v. Cerpe,* 957 A.2d 907, 914 (D.C.2008); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (noting that, under Title VII of the Civil Rights Act of 1964, "if the victim does not subjectively

perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment").[4]

The trial court's initial instruction to the jury was incomplete because it did not convey the requirement that the alleged sexual harassment, in addition to being objectively offensive (i.e., to "a reasonable person in the plaintiff's position"), must have been subjectively perceived as offensive by the employee claiming discrimination and affected the terms and conditions of employment. In addition, when the jury note asked for a definition of the term "hostile," the trial court was under an "obligation" to respond to the jury's confusion " 'with concrete accuracy,' " *Preacher v. United States*, 934 A.2d 363, 367–68 (D.C. 2007) (quoting *Alcindore v. United States*, 818 A.2d 152, 155 (D.C.2003)), in an effort to " 'clear away that confusion.' " *Id.* at 368 (quoting *Alcindore*, 818 A.2d at 159 n. 11). In this case, the jury asked for help in understanding a term in the instruction ("hostile") that this court has defined. *See, e.g., Lively*, 830 A.2d at 889; *Daka*, 711 A.2d at 92. The court's response that "there's not a definition at this point" was incorrect as a matter of law.[5] Even after a

recess, in which the court expressed dissatisfaction with the instruction and acknowledged having found a definition of "hostile" in this court's *Lively* opinion, the court inexplicably decided against correcting its deficient response to the jury's note. At each step—in the initial incomplete instruction, in the incorrect re-instruction, and in the failure to correct the re-instruction—the trial court erred.

■■■ " 'When reviewing jury instructions, [we] must look at the instructions as a whole in assessing whether they constitute[ ] prejudicial error.' " *Chadbourne v. Kappaz*, 779 A.2d 293, 297 (D.C.2001) (quoting *Hunt v. United States*, 736 A.2d 322, 325 (D.C.1999)). "A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *East Capitol View Community Development Corp., Inc. v. Robinson*, 941 A.2d 1036, 1039 (D.C. 2008). "[D]ecisions on how to reinstruct a jury are within the trial court's discretion

---

4. The pattern instruction for hostile work environment claims provides:

In order to establish the existence of a hostile work environment, the Plaintiff must establish the following:
(1) that [he/she] is a member of a protected class,
(2) that [he/she] had been subjected to unwelcome harassment,
(3) that the harassment was based on [his/her] membership in the protected class, and
(4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.

Standardized Civil Jury Instructions for the District of Columbia, No. 24–8 (2009).

5. Appellants' proposed instruction, see note 3, *supra*, does not make explicit that "alter[ing] the conditions of employment" includes *Lively's* requirement that the jury find both that a reasonable person would, and that the plain-

tiff actually did, perceive the work environment to be hostile or abusive. Appellants did point the court to federal case law defining " 'hostile' for purposes of Title VII ... [as a situation in which] the offensive conduct 'permeates [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bryant*, 475 F.Supp.2d at 28. The Supreme Court has drawn a clear link between the subjective perception that conduct is abusive and alteration of the terms of employment. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. In deciding issues under the DCHRA, this court "consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority." *Daka, Inc.*, 711 A.2d at 94.

and will not be reversed absent an abuse of that discretion." *Preacher,* 934 at 367–68. Absent prejudice, an erroneous instruction will be deemed harmless, i.e., not an "abuse" of discretion. *Lacy v. District of Columbia,* 408 A.2d 985, 990 (D.C.1979). To find harmless error, we must be "able to say with 'fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997)). This court will reverse a jury verdict, however, if confusing, contradictory, or incomplete jury instructions may have affected the verdict. *See Ray v. American National Red Cross,* 696 A.2d 399, 405 (D.C.1997). In many cases a fundamentally flawed jury instruction on a central claim in the case will constitute prejudicial error. *See id.* at 990–91 (finding prejudicial error because jury instruction placed a higher burden on plaintiff than required in a negligence case). However, there are situations, though rare, where an incorrect or incomplete instruction concerning a legal requirement will not warrant reversal. For example, in the criminal context, we have held that the "failure to instruct on an element of an offense will not be the cause for a reversal at least where ... the relevant facts are so closely related that no rational jury shown by its verdict to have found the facts necessary to convict the defendant under the instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element." *Green v. United States,* 948 A.2d 554, 559–60 (D.C.2008) (quoting *White v. United States,* 613 A.2d 869, 870 (D.C.1992) (en banc)).

Appellants contend that the trial court's failure to provide a complete definition of what constitutes a "hostile work environment" allowed the jury to find them liable based solely on the jury's *objective* view of the work environment as "offensive," even if the jury did not also find that it was subjectively offensive to Stamenkovic as *Lively* requires. 830 A.2d at 889. This was prejudicial, they claim, because "there was compelling record evidence that would have supported a jury determination that [Stamenkovic] did not regard the alleged harassment as severe or pervasive while he was employed at Campbell–Crane, but rather came to this conclusion only *after* he decided to sue." In support of their contention, appellants point to evidence presented at trial that Stamenkovic (1) complained to no one about the alleged years of harassment until he hired a lawyer; (2) did not seek medical treatment for his emotional distress until three months after he filed suit; (3) was a physically fit young man with an active social and sexual life; and (4) voluntarily participated in a host of extracurricular activities with Campbell unrelated to his job duties, including a trip to New York, and many after-hours parties. This evidence that Stamenkovic did not feel harassed, appellants argue, was corroborated by testimony from other employees about Campbell–Crane's friendly, close-knit work environment.

In evaluating appellants' claim of prejudice, we consider the language of the jury instructions as a whole. *See Chadbourne,* 779 A.2d at 297. Stamenkovic claims that, even if the trial court did not provide a proper definition of what makes a work environment "hostile," the instructions nonetheless conveyed that the jury needed to determine that he subjectively experienced the employer's conduct as offensive and harassing. Specifically, he points to the trial court's definition of "unwelcome conduct," as "conduct which *the employee* did not solicit or incite and *the employee* regarded as undesirable or offensive." (em-

phasis added). Although we can agree that the trial court's definition of "unwelcome conduct" focuses on the employee's subjective perception, this language, by itself, did not make it sufficiently clear to the jury that to make a finding of liability based on a hostile work environment, the sexually harassing conduct must be not only "unwelcome" to the plaintiff but also so "severe and pervasive"—both objectively to a reasonable person *and* subjectively to the particular employee—as to have an actual impact on the terms and conditions of the employee's employment.

Where we do find language that clearly instructed the jury about the required finding of subjective impact on Stamenkovic of the offensive work environment is in the trial court's instructions on compensatory damages, which, the trial court said, are meant to "fairly and reasonably compensate [Stamenkovic] for all of the damage which *he experienced* [and] which was *proximately caused* by the defendant." (emphasis added). The court's instructions on damages repeatedly emphasized the causation element necessary for a calculation of compensatory damages; the jury was never instructed on any other type of damages. The court explained to the jury that "[t]he plaintiff is entitled to damages that the defendants' wrongful conduct proximately caused," and cautioned that they could "only award the plaintiff damages for injury that is not speculative," such as "any physical pain and emotional distress . . . any inconvenience [and] . . . any loss of earnings." We presume that the jury followed the instructions of the court. *See Taylor v. United States,* 866 A.2d 817, 826 (D.C.2005). Because an award of compensatory damages required a finding of *subjective* actual injury to the plaintiff caused by the defendant's wrongful conduct, we conclude that the jury, in awarding $800,000 to Stamenkovic, necessarily must have found that he subjectively suffered from sexual harassment severe and pervasive enough to have altered the terms and conditions of his employment, i.e., a hostile work environment. *See Green,* 948 A.2d at 559–60.

Appellants' contention that the jury did not consider whether Stamenkovic subjectively suffered from pervasive and severe sexual harassment is impossible to reconcile with the jury's decision to award $800,000 in compensatory damages. For appellants to be correct, the jury would have had to find that even though Campbell's conduct was *objectively* harassing (i.e., to a reasonable person), and Stamenkovic himself did not *subjectively* suffer from the harassment, yet this harassment proximately caused injuries to Stamenkovic the jury valued at $800,000. It is highly improbable that a jury would believe Stamenkovic's description of the sexual harassment but not his claim that he was seriously affected by it. Moreover, it would be either inherently contradictory (or against the jury instructions) for the jury to then conclude that an injury that Stamenkovic did not suffer personally nonetheless entitled him to $800,000 in compensatory damages to "fairly and reasonable compensate [Stamenkovic] for all of the damage *he experienced.*" (emphasis added). We do not lightly impugn a jury with such irrationality or disobedience.

Our conclusion that the jury made the requisite finding that the sexually charged environment created by Campbell's conduct was subjectively offensive to Stamenkovic and affected the terms and conditions of his employment is further corroborated by the nature of the evidence presented at trial. Stamenkovic testified that Campbell directed sexually harassing comments to him during the three years he was employed at Campbell–Crane, including sexual innuendo, outright propositions, ridicule, insults,

domination, humiliation, and intimidation. According to Stamenkovic, Campbell repeatedly engaged in discussions regarding sex and made demands for sex, tried to exercise control over Stamenkovic's personal life, and was inappropriately possessive of him. She also threatened that her continued sponsorship of his work visa and immigration application could turn on his response to her sexual advances. Stamenkovic's testimony recounted Campbell's harassment and the injury he suffered as intrinsically connected, and described his mental anguish as a direct consequence of Campbell's behavior.[6]

Appellants argue that, if properly instructed, the jury could have reasonably concluded that the claim of hostile work environment was a fabrication based on evidence presented at trial that: (1) it was Campbell's demanding management style that provoked Stamenkovic's belated claims of sexual harassment, even though he did not find her overtures to be "hostile" at the time they were made; (2) Stamenkovic did not complain that he had been "harassed" by Campbell until he met with counsel to pursue a litigation strategy devised by his counsel, (3) rather than being an emotional wreck because of the alleged harassment, as he claimed at trial, Stamenkovic actually flourished professionally and financially at Campbell–Crane. Appellants contend that the deficient jury instruction effectively directed the jury to disregard these key pieces of evidence concerning appellee's possible motivation for filing suit, his actual state of mind while he was employed by Campbell–Crane, and the reasonable inference that could be drawn—that he was not, in fact, personally affected by the sexually-charged atmosphere at the firm—when it was assessing liability on the hostile work environment claim.

Appellants, however, did not raise any of these alternative defense theories during trial or in their closing argument. Rather, their theory was that Stamenkovic fabricated the sexual harassment claim in a ploy to retain his green card sponsorship. In any event, the evidence on which appellants rely was presented to the jury, which apparently did not draw the inferences appellants now urge on appeal. Moreover, appellants' argument overlooks that Stamenkovic described his physical and emotional problems as a direct consequence of Campbell's behavior. Stamenkovic testified that, as a result of the continuous sexual harassment and Campbell's threat to discontinue sponsorship of his green card if he resisted her advances, he experienced stomach pains, vomiting, shaking, crying, fluctuations in weight, difficulty sleeping, general rage, depression, erectile dysfunction, and shame. Zivkovic offered some corroboration, testifying that he recalled Stamenkovic's weight fluctuating during the time he worked at Campbell–Crane, although he did not testify as to whether he was told about the cause.

Stamenkovic admitted that he did not seek any counseling or treatment for his emotional distress until three months after he hired a lawyer, and thus was unable to provide medical records to support his claims of mental and physical distress during his employment at Campbell–Crane. However, he presented the testimony of Dr. William Lawson, a psychiatrist who had seen Stamenkovic ten to twelve times over a three-year period, from August of

---

6. For example, Stamenkovic testified, "I just [told my friends] that my job is getting worse and worse and that I cannot handle it anymore; I'm getting very tired; I'm getting very sick." Stamenkovic also explained that Campbell's behavior made him "more and more irritated, more and more angry. My stomach started hurting more and more. I was getting more and more depressed."

2005 to June of 2008, after he had left Campbell–Crane's employ. Dr. Lawson testified that he understood his patient's complaint as being that Campbell "ma[de] sexual demands on him and that if he didn't comply with her demands that there was a possibility that he might be deported." Dr. Lawson diagnosed Stamenkovic as suffering from PTSD linked to stressors Stamenkovic had recounted throughout the three years of therapy, including the fear of deportation from the United States, and the military conscription and possible imprisonment he would face if he were forced to return to Serbia. In short, the testimony presented by Stamenkovic and Dr. Lawson supported that Stamenkovic actually perceived the work environment as hostile, and suffered physical and emotional distress as a result.

The alternative appellees would have us accept is that the jury did not credit Stamenkovic's testimony or that of Dr. Lawson, but instead relied on other evidence to support its determination that Campbell's sexual conduct created a work environment that was objectively offensive and, as a result, awarded $800,000 in damages, but without finding that Stamenkovic perceived it as sexual harassment. This possibility we regard as exceedingly remote in light of the scant evidence (other than Stamenkovic's testimony) introduced at trial to support such a determination. The evidence supporting a finding of sexual harassment independent of Stamenkovic's testimony consisted of: (1) an email from Campbell to Stamenkovic in which she called herself his "Green Card Girl," suggesting he should "dance with [her] at [the] party" if he wanted to keep his green card; (2) testimony from Linnsey Workman, another employee at Campbell–Crane, that in a public function Campbell had accused Workman and Stamenkovic of "sleeping" together; (3) testimony from Zivkovic, one of Stamenkovic's friends,

who stated that at Stamenkovic's birthday party, which took place at Campbell's residence, he saw Campbell kissing a man while swimming in her pool wearing only the bottom part of her underwear; and (4) testimony from Dan Crane, Campbell's former business associate, that in October of 2002, Crane had expressed his displeasure directly to Campbell regarding her dealings with Stamenkovic, that Campbell had swum naked at least once in her home pool with office staff during a party, and that Campbell had told Crane that she would destroy her journals before turning them over to Stamenkovic during discovery. Although this evidence presented an unflattering and unprofessional picture of Campbell, it was offset, however, by testimony presented by six co-workers who testified that, despite the close work environment at Campbell–Crane, they never saw or heard any indications of the sexual harassment that Stamenkovic claimed occurred over a three-year period.

In sum, we cannot agree with appellants that the error in the jury instructions on what constitutes a "hostile" working environment "substantially swayed" the verdict. *Lacy,* 408 A.2d at 990. We conclude that, in light of the evidence presented at trial, the jury must have credited Stamenkovic's evidence that he was subjected to egregious and repeated sexual harassment over a long period of time and, based on that evidence, found that Campbell's conduct was not only objectively offensive, but also subjectively offensive to Stamenkovic, thereby creating a "hostile" work environment. Any other conclusion would lose sight of the evidence and the jury's award of significant damages to compensate Stamenkovic for injury he suffered personally as a result of the sexual harassment. Therefore, although the trial court erred in not providing a complete definition of what constitutes a "hostile" work environment,

we are satisfied there was no prejudice to appellants.

### B. *Nominal Damages*

Appellants also claim that the trial court erred in failing to give the jury a standard instruction on nominal damages. At trial, Stamenkovic's counsel requested that the instruction on nominal damages be struck from the jury instructions on damages. The trial court warned counsel:

> I can delete that if you want to, but here's the problem. In terms of damages, it's not as though they're really going to be able to sit down with a calculator and say, well, he has this much in losses, he has this much in losses, he has this much in losses. So, I mean, it seems to me if you want to foreclose yourself from a damage award, if you don't allow the jury to give you nominal damages. But you can if you want to.

Appellants agreed with the trial court that the instruction on nominal damages should be given, but Stamenkovic's counsel insisted on its exclusion, even over the trial court's second warning that "on this record [ ] it's difficult, if not impossible, to make a calculation of compensatory damages." Instead, at Stamenkovic's counsel's request, the trial court provided the jury with the following instruction on damages:

> Now, on the issue of damages, if you find for the plaintiff, then you must award the plaintiff a sum of money which will fairly and reasonably compensate him for all of the damage which he experienced which was proximately caused by the defendant. The plaintiff is entitled to damages that the defendants' wrongful conduct approximately caused. The defendants are liable only for the damage that their conduct caused. If you find that the defendants' conduct caused only part of plaintiff's

damage, then the defendants are liable only for that part.

> . . .

> You may only award the plaintiff damages for injury that is not speculative. Speculative damages are those that might be possible but are remote or based on guesswork.

> . . .

> You must determine what amount will fairly and reasonably compensate the plaintiff for his injuries and/or damages. You should then return a verdict in that amount against the responsible defendant. If you find in favor of the plaintiff, then you should consider whether he is entitled to any damages. You may award damages for any of the following items that you find the defendants proximately caused: [The list of items that followed included "any physical pain and emotional distress," "any inconvenience," and "any loss of earnings."]

▇ Appellants claim that the evidence of Stamenkovic's damages was "so ephemeral" that a nominal damages instruction was necessary to inform the jury that it was not required to award appellee substantial monetary damages even if it found liability. A nominal damages instruction was appropriate, they argue, because the jury could have reasonably concluded from the evidence that appellee failed to prove that his alleged emotional injuries were attributable to the hostile work environment, or were sufficiently serious to warrant a significant award. *See Wisdom v. Armstrong*, 196 A.2d 88, 90 (D.C.1963) (affirming use of a jury instruction that "amounted to an instruction that the jury might award nominal damages if they found that plaintiff failed to prove that his injuries and expenses were attributable to the collision").

Stamenkovic argues that the jury was clearly and carefully instructed on damages, via Standard Civil Instruction 13–1, which was modified only as to the enumerated elements of damages. *See* Standardized Civil Jury Instructions for the District of Columbia (2008 ed. rev.). This instruction, he says, clearly explained to the jury that any damage award could only redress actual injury suffered by Stamenkovic that was caused by appellants. Therefore, informing the jury about "nominal damages" would have been redundant.

■■■ We review the trial court's decision to instruct the jury on compensatory damages, but not nominal damages, for abuse of discretion. *See Modern Mgm't Co. v. Wilson,* 997 A.2d 37, 46 (D.C.2010). Even after warning Stamenkovic that it would be in his interest to allow the trial court to instruct the jury on nominal damages, Stamenkovic insisted that the court instruct the jury only on compensatory damages. We cannot say that the trial court abused its discretion in instructing the jury solely on compensatory damages, particularly where the instruction makes clear that a finding of liability does not automatically lead to damages ("If you find in favor of the plaintiff, then you should consider *whether* he is entitled to any damages." (emphasis added)) and that damages are to be awarded only for injury caused by the defendants ("If you find that the defendants' conduct caused only part of the plaintiff's damage, then the defendants are liable *only for that part.*" (em-

phasis added)). But, even if this decision was erroneous, it would be harmless given that the jury awarded Stamenkovic $800,000, which directly controverts appellants' claim that the jury would have awarded a "trifling amount" had the jury been instructed on nominal damages. See RESTATEMENT (SECOND) OF TORTS § 907 (defining nominal damages as "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages"). The trial court's instructions made clear to the jurors that they were to award damages only if they found in favor of Stamenkovic, and that "[t]he defendants are liable *only for the damage that their conduct caused.*" (emphasis added.) To have awarded a significant amount in damages, even if the jury thought Stamenkovic was not injured, or injured only slightly, as a result of appellants' conduct, would have been contrary to the judge's instruction. Because we presume that the jury followed the court's instructions, *see Taylor,* 866 A.2d at 826, we conclude that the jury's damages award was not swayed by the absence of an instruction on nominal damages, but reflected the jury's assessment of the injury caused by appellants.[7]

## III. Evidentiary Challenges

### A. *Rebuttal Witness*

■■■■ Appellants contend that the trial court abused its discretion in allowing Dan Crane[8] to testify as a rebuttal witness

---

7. The jury showed that it understood the difference between liability and damage. For example, although the jury found for Stamenkovic on the wage claim, it did not award any damages.

8. In 1992, Dan Crane joined Campbell's firm as a lobbyist. As a result of their close business relationship, the firm was renamed Campbell–Crane and Associates, Inc. Crane worked at Campbell–Crane for fourteen years,

but early in July of 2005, while still working for Campbell–Crane, he formed a competing firm, which led to professional and personal recriminations between him and Campbell. By the time trial on Stamenkovic's lawsuit began in 2008, Crane and Campbell were neither close business associates nor friends; Campbell had sued Crane alleging that he had breached his fiduciary duties to Campbell–Crane.

to impeach Campbell with testimony about collateral matters they claim were highly prejudicial and inflammatory. "In order to protect a defendant from surprise, [a plaintiff] should not advance new arguments on rebuttal." *Shelton v. United States,* 983 A.2d 979, 985 (D.C.2009) (citing *Porter v. United States,* 826 A.2d 398, 409 (D.C.2003)). Rather, "rebuttal evidence should be presented to refute, contradict, impeach or disprove the evidence that the adversary has already elicited." *Id.* (citing *Beynum v. United States,* 480 A.2d 698, 704 (D.C.1984)). We have said that "[t]his rule is not an inflexible one, and the trial court has discretion to determine whether rebuttal evidence will be allowed." *Porter,* 826 A.2d at 409; *McCoy v. United States,* 760 A.2d 164, 185 (D.C.2000). We will overturn a decision to admit or exclude evidence only upon a showing that the trial court abused its discretion. *See Knight v. Georgetown University,* 725 A.2d 472, 477 (D.C.1999). Applying this standard, we conclude that the trial court did not abuse its discretion in allowing Crane to testify as a rebuttal witness.

Although Crane's name did not appear on Stamenkovic's witness list or pretrial statement, the trial court allowed him to testify as Stamenkovic's last witness, on rebuttal. The Superior Court Rules allow for such a witness to be called exclusively for purposes of impeachment or rebuttal, unless the witness was previously unknown to the party. *See* Super. Ct. Civ. R. 16(b)(2); *Hechinger Co. v. Johnson,* 761 A.2d 15, 22 (D.C.2000). Crane testified that he had a sexual relationship with Campbell while he was a partner at Campbell–Crane, and about statements Campbell made to him about her sexual escapades and preferences. Crane was also permitted to testify, over objection, that: (1) Campbell engaged in "dirty dancing" and made out in public with a friend at an office Christmas party in 2003 or 2004; (2)

Crane had expressed his displeasure directly to Campbell about her conduct toward Stamenkovic (specifically, she "was trying to get [Stamenkovic] into the sack," and was "drinking with" and "running around with" Stamenkovic "in the middle of the afternoon" in October 2002 instead of attending a previously-scheduled fundraiser with Crane); (3) Campbell swam naked in her home pool in front of Stamenkovic and Crane; and (4) Campbell told Crane that she would destroy her journals before turning them over to Stamenkovic.

Appellants contend that Crane's testimony served more than impeachment purposes and that Stamenkovic called Crane as a rebuttal witness as a way to circumvent the failure to identify Crane as a potential fact witness before trial. Appellants also argue that for Crane to inject, as rebuttal testimony, his prior, consensual sexual relationship with Campbell in a trial where the claim was that Campbell's sexual conduct was harassment that had created a hostile work environment for Stamenkovic was irrelevant and highly prejudicial; and that Crane's testimony lent unfair support to Stamenkovic's testimony that Campbell "sleep[s] with everyone she works with." According to appellants, Crane's testimony was unduly inflammatory even as to the non-collateral matters that Crane addressed during his testimony.

Stamenkovic responds that Crane's testimony regarding his sexual relationship with Campbell served to rebut the testimony of defense witness Linnsey Workman, who had previously testified that she knew nothing of any intimate relationship between Crane and Campbell, nor of any sexual harassment of Stamenkovic by Campbell. Appellants proffered Workman's testimony in order to prove the theory that, because Campbell–Crane's office was so small, Workman would have heard

or known about any sexual harassment of Stamenkovic had it occurred. However, as Stamenkovic points out, the existence of a sexual relationship between Crane and Campbell that Workman did not know about would undermine Campbell's argument that Workman's ignorance of any sexual harassment of Stamenkovic was evidence that it did not take place. Crane's testimony that such a relationship did in fact exist while he worked at Campbell–Crane, if credited by the jury, would directly contradict Workman's testimony, and was therefore properly presented in rebuttal.

As to the other disputed comments in Crane's testimony, Stamenkovic contends on appeal, as he did at trial, that they served to directly rebut the testimony presented by Jilani as well as Campbell. Jilani testified that she had lunch with Crane to tell him that he should not try to dictate Campbell's conduct as she was a consenting adult; Crane denied ever having had lunch with Jilani. Crane's testimony also served to impeach Campbell's testimony, in which she denied having a conversation with Crane about her treatment of Stamenkovic, swimming naked in the pool in front of office employees, and having journals with notes about Stamenkovic that she refused to produce during discovery. The trial court agreed with Stamenkovic's counsel that this was rebuttal evidence relevant to the issues at trial and overruled all of appellants' objections. Because Crane's testimony did, in fact, rebut the testimony presented by Workman, Jilani, and Campbell, we cannot say that the trial court abused its discretion in allowing

this testimony to be introduced in rebuttal.[9]

## B. Evidence of Alternative Causes of Stamenkovic's Emotional Distress

Appellants contend that the trial court abused its discretion by excluding relevant evidence which offered alternative and relevant explanations for Stamenkovic's emotional distress. Here, too, we review the trial court's decision for abuse of discretion. See Knight, 725 A.2d at 477.

### 1. Stamenkovic's Investments in Real Estate

■ Appellants argue that they should have been permitted to introduce evidence of Stamenkovic's real estate holdings to show that "[his] private real estate activities were a source (if not the source) of the stress in his life," and that the crushing debt load that was caused by the purchase of five condominium units as investments could explain his motive for filing suit in the first place. Appellants claim that the trial court should have allowed them to further develop this line of questioning by providing details about the "timing and sequence" of his purchases and the "severity of his debt and the strain that it placed him under." Stamenkovic's activities outside his employment with Campbell were relevant "to *his* motive for suing; to the source of *his* claimed distress; [ ] to whether the purported harassment affected the terms, conditions, or privileges of *his* employment; and whether *he* suffered any emotional harm at all while at Campbell–Crane." According to appellants, in limiting their ability to pursue this line of

9. Appellants' argument that Crane's testimony prejudiced Campbell because it disclosed information he had obtained in strict confidence from Campbell when he was still employed by Campbell–Crane borders on the frivolous. Appellants cite attorney-client priv-

ilege cases, although they do not explicitly claim that such a privilege was being violated, as they could not because the record clearly indicates that Crane was neither a member of the bar nor Campbell's attorney during Stamenkovic's employment at Campbell–Crane.

inquiry, the trial court committed reversible error.

We agree with Stamenkovic that appellants overstate the effect of the trial judge's exclusionary ruling. The trial court initially granted Stamenkovic's motion in limine to preclude appellants from introducing "any evidence of [Stamenkovic's] alleged wealth, debt, financial situation, and real estate holdings." At trial, Campbell testified that Stamenkovic had told her that the depression and anxiety he suffered were due to the stress of owning several condominium units. Stamenkovic confirmed this was so, but explained that he had lied to Campbell about the causes of his distress to hide the fact that it was actually her sexual harassment that was causing him anxiety. After this testimony, appellants asked the judge to reconsider the pretrial exclusionary order. The trial court then allowed questioning about Stamenkovic's anxiety and financial distress related to his real estate investments. In direct response to counsel's proffer, the trial judge allowed appellants to introduce evidence, as the trial judge informally put it, that Stamenkovic "purchased five [condos], sold one, made some money, and he lied to [Campbell] about it." Campbell, for example, testified that Stamenkovic was interested in investing in real estate in New York. At one point, Campbell said, Stamenkovic was trying to get a third mortgage on three pieces of property and "asked [Campbell] how he could get closer to $50,000, the cutoff point for refinancing his mortgages." However, she testified, he had never achieved a command of English "enough to justify the kind of salary he needed for his mortgage"; was "very upset about his mortgages" and "very worried about his finances." Similarly, in appellants' cross-examination of Stamenkovic, he confirmed that he had owned five condominium units at one time, and still owned, at the time of trial, four condominium units, including one in Miami Beach, Florida.

Notwithstanding the trial court's limitations, appellants were able to elicit evidence of Stamenkovic's worry over his real estate investments. Thus, even though the trial court restricted the amount of detail [10] appellants would have preferred, they were not harmed as they were able to introduce evidence from which the jury could infer—as appellants' counsel urged them to do in closing argument—that any emotional distress Stamenkovic suffered was due to causes other than Campbell's harassing conduct, or, alternatively, that the fact that Stamenkovic was involved in these activities showed he was not the emotional wreck he claimed to be as a result of Campbell's harassment.

### 2. Stamenkovic's Alleged Illegal Gambling Operation

■ Appellants also contend that the trial court erred in not allowing them to introduce evidence regarding Stamenkovic's illegal bookmaking operation as an alternative source of stress.

■ Campbell claimed that after the close of discovery, an expert performed a forensic examination of the computers in the Campbell–Crane offices that revealed Stamenkovic's extensive bookmaking activities while on the job. Subsequently, on October 3, 2007, appellants sought leave to file a Rule 26(b)(4) statement to identify an expert witness to testify about the examination, claiming that evidence of the gambling operation ought to be allowed under

---

**10.** What the trial court's ruling precluded were *details* about the real estate investments. ("I don't want to hear where the condo is.... I don't want to get into details about these condos.")

the "after acquired evidence" doctrine. *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). This doctrine allows for the introduction of evidence of an employee's wrongdoing that has been found subsequent to termination of the employment in order to calculate and reduce damages. The Supreme Court in *McKennon* stated that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." *Id.* The consequence is that the employer is not liable for reinstatement or front pay from the time that the employee could have been lawfully terminated. *Id.*

Appellants claimed pre-trial, in their motion to file a Rule 26(b)(4) statement, that, had Campbell known about Stamenkovic's alleged gambling operation while on the job when it occurred (before his employment was terminated), she would have been justified in terminating his employment and his final damages for lost wages would have been reduced. This argument was rejected by the trial court, reasoning that by the time Campbell found out about the gambling operation, Stamenkovic had already mitigated his damages by securing other employment, thereby eviscerating the only basis of relevance offered.

We need not address the merits of the trial court's reasons for excluding the evidence because, on appeal, appellants do not reiterate the claim made at trial concerning damages, but rather contend only that the trial court should have allowed evidence of the gambling operations as an alternative stressor that might have caused Stamenkovic emotional distress. This argument, however, was only raised post-trial, in appellants' motion for judgment as a matter of law or for a new trial, and thus must be reviewed for plain error. *See, e.g., Cox v. United States*, 898 A.2d 376, 382 n. 6 (D.C.2006). On this record, where there is ample evidence that Stamenkovic was subjected to egregious sexual harassment, and the jury did hear about Stamenkovic's financial worries related to his real estate investments, the trial court did not commit plain error in failing, *sua sponte*, to admit the new evidence of Stamenkovic's gambling activities as another potential source of emotional distress.

## IV. Compensatory Damages

■ Appellants claim that the trial court abused its discretion in failing to set aside an "excessive" verdict of $800,000 for emotional distress as compensatory damages. This claim arises from the trial court's denial of appellants' post-verdict motion for judgment as a matter of law or for a new trial. We conclude that the amount of the award was not so "extraordinarily disproportionate to the injuries and losses claimed" as to entitle appellants to judgment, *Scott v. Crestar Financial Corp.*, 928 A.2d 680, 688 (D.C.2007), and that the trial judge did not abuse discretion in denying the motion for new trial and upholding the jury's verdict.

■ The motion for judgment is essentially a challenge to the sufficiency of the evidence supporting the award of compensatory damages, and our review is *de novo*, applying the same legal standard as the trial court. *See NCRIC, Inc. v. Columbia Hosp. For Women*, 957 A.2d 890, 902 (D.C.2008). That standard is demanding, as judgment setting aside a jury verdict may be granted "only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor." *Id.* (quoting *Liu v. Allen*,

894 A.2d 453, 459 n. 10 (D.C.2006)). In short, the central question is whether the verdict "is beyond all reason, or . . . is so great as to shock the conscience." *Scott,* 928 A.2d at 688. An award of damages "must strike a balance between ensuring that important personal rights are not lightly disregarded, and avoiding extravagant awards that bear little or no relation to the actual injury involved." *Phillips v. District of Columbia,* 458 A.2d 722, 726 (D.C.1983). Thus, the award "must be proportional to the harm actually suffered." *Id.* However, because some injuries are incapable of exact quantification, "[a] court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Langevine v. District of Columbia,* 106 F.3d 1018, 1024 (D.C.Cir. 1997) (holding trial judge did not abuse discretion by reinstating jury's award of damages on false arrest and false imprisonment claims, including $200,000 for bodily injury, physical pain and suffering, and mental anguish).

 Our review of a denial of a motion for new trial is deferential. "On appeal, this court 'must accord great deference to the trial court's decision to grant or deny a motion for new trial based on excessiveness of the verdict and may reverse that decision only for an abuse of discretion.'" *Finkelstein v. District of Columbia,* 593 A.2d 591, 596 (D.C.1991) (quoting *Louison v. Crockett,* 546 A.2d 400, 403 (D.C.1988)). "The scope of appellate review is especially narrow when the trial court denied the motion, as in that case the trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference given to the jury's determination of such matters of fact as the weight of the evidence." *NCRIC, Inc.,* 957 A.2d at 902 (quoting *Liu,* 894 A.2d at 459 n. 10). "When a party

moves to strike a verdict as excessive, the trial court must consider whether that verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements." *Moss v. Stockard,* 580 A.2d 1011, 1013 (D.C.1990) (quoting *Louison,* 546 A.2d at 403).

 Appellants claim that "[a]n $800,000 award for a plaintiff who sustained no physical injury and suffered no permanent emotional distress, found a new job within months of his departure, and got married shortly thereafter, is simply unreasonable and excessive." It is not our role to credit or weigh the evidence of injury, however, and in determining whether appellees are entitled to judgment, we have to assume that the jury credited Stamenkovic's testimony about the impact of the harassment while he was working at Campbell–Crane and Dr. Lawson's testimony about the psychological consequences. Stamenkovic testified that Campbell's sexual harassment was egregious and extended for three years. During this time, Stamenkovic also was afraid that if he displeased her, Campbell would not sponsor his work visa and immigration application and he would be deported to Serbia. As a result, he suffered from anxiety, depression, sleeping disorders, stomach pains, and weight fluctuations, among other symptoms. Other evidence corroborated Stamenkovic's testimony: Zivkovic, Stamenkovic's friend, testified that Stamenkovic's weight fluctuated during this time; three emails written by Campbell or Stamenkovic, referred to Campbell as Stamenkovic's "Green Card Girl" and linked her sponsorship for his visa and immigrant status to his compliance with her sexual propositions; and Dr. Lawson, who diagnosed Stamenkovic as suffering from PTSD and treated him for a period of three years after Stamenkovic left Campbell–Crane. Although Dr. Lawson testi-

fied that appellee's condition was not permanent, he anticipated that Stamenkovic would require ongoing medication and cognitive therapy. Because there is sufficient evidence from which a reasonable jury could find that Stamenkovic suffered significant mental and physical distress caused by the hostile work environment, we cannot say that the jury's damage award "shock[s] the conscience," *Scott*, 928 A.2d at 688, or "resulted from passion, prejudice, mistake, oversight, or consideration of improper elements." *Finkelstein*, 593 A.2d at 596. The jury was properly instructed on compensatory damages, and, if there is a reasoned basis for an award, "mathematical precision" is not required. *Affordable Elegance Travel, Inc. v. Worldspan L.P.*, 774 A.2d 320, 329 (D.C.2001). This is especially so in the case of damages for mental and emotional distress, and " 'courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible.' " *NCRIC, Inc.*, 957 A.2d at 903 (quoting *Hawthorne v. Canavan*, 756 A.2d 397, 401 (D.C.2000)).

Appellants' also argue that where, as here, the evidence shows that the only support for a substantial jury award is psychological trauma or mental distress, the trial court's failure to offer any explanation for its decision to deny the motion for new trial, and leave the award intact, warrants a remand. Appellants rely on *Louison*, 546 A.2d at 401, where we remanded the case to the trial court for clarification after expressing concern with the trial court's lack of explanation in affirming the "extraordinary high damage award" of $725,000. *Id.* at 406–407. But we made clear in *Louison* that "[w]e do not suggest that such a statement must accompany every denial of remittitur," but only where "the record on its face provides questionable support for the verdict, and elucidation by the trial court might clarify the matter." *Id.* at 407; *see Faggins v. Fischer*, 853 A.2d 132 (D.C.2004) (affirming trial judge's decision that damages awarded were excessive based on evidence presented in the case even though trial court did not explain its rationale). It is somewhat puzzling that the trial judge did not articulate any reasons for affirming the jury's verdict, after having commented during trial that "on this record [ ] it's difficult, if not impossible, to make a calculation of compensatory damages," and for that reason, urged counsel to accept an instruction on nominal damages. But, the trial court's silence may simply reflect a recognition that its own assessment of the evidence may not trump that of the jury. Unlike in *Louison*, where the plaintiff's claim arose from a single incident in the defendant doctor's office that caused a minor physical injury and alleged psychological damages, here Stamenkovic introduced evidence of sexual harassment that persisted for three years and involved an array of aggressive, humiliating, and offensive sexual propositions and innuendo that continued to have an impact, even after the employment relationship terminated, in the form of PTSD. Moreover, we decline to engage in comparisons with damages awarded in other cases. "Because of the unique circumstances of each case . . ., it is awkward to discuss the size of an award through comparison with past decisions." *Peyton v. DiMario*, 287 F.3d 1121, 1127 (D.C.Cir.2002) (quoting *Mariner v. Marsden*, 610 P.2d 6, 16 (Wyo.1980)); *see Thomas v. Mineta*, 310 F.Supp.2d 198, 207–8 (D.D.C.2004). Thus, we are not persuaded by appellants' argument that the compensatory damages awarded to Stamenkovic are unreasonable in light of amounts awarded in prior, dissimilar cases. The evidence presented by Stamenkovic,

which was presumably credited by the factfinder, could have reasonably led the jury to award Stamenkovic $800,000 in compensatory damages for mental and physical distress.

## V. Attorneys' Fees

■ Appellants' final claim is that the trial court's award of $443,874.50 in attorneys' fees and $11,865 in costs should be vacated and the case remanded because the trial court failed to provide any explanation to support the award. Appellant relies on *Federal Marketing Co. v. Virginia Impression Products Co., Inc.*, 823 A.2d 513 (D.C.2003), for the proposition that the "failure to articulate the reasons for a particular fee award renders the trial court's determination effectively unreviewable and has been held to constitute an abuse of discretion warranting reversal." *Id.* at 530.

■ "Our scope of review [of] an award of attorney[s'] fees is a limited one because disposition of such motions is firmly committed to the informed discretion of the trial court. Therefore, it requires a very strong showing of abuse of discretion to set aside the decision of the trial court." *Watkins v. District of Columbia*, 944 A.2d 1077 (D.C.2008). "[I]n reviewing a trial court's exercise of discretion, an appellate court should take cognizance of the nature of the determination being made and the context within which it was rendered. If need be, it may examine the record and infer the reasoning upon which the trial court made its determination." *Johnson v. United States*, 398 A.2d 354, 365–66 (D.C.1979).

■ We have held that the appropriate means to determine reasonable attorneys' fees is for the trial court to "determine first the so-called lodestar—the number of hours reasonably expended by counsel multiplied by a reasonable hourly rate—

and then, 'in exceptional cases,' mak[e] upward or downward adjustments as appropriate." *Federal Marketing Co.*, 823 A.2d at 530 (quoting *Hampton Courts Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 599 A.2d 1113, 1115 (D.C. 1991)). "A number of discrete factors that may support adjustment of the lodestar figure have been identified for consideration." *Id.* (quoting *Frazier v. Franklin Inv. Co., Inc.*, 468 A.2d 1338, 1341 (D.C. 1983)). However, all of these potentially relevant factors are not necessarily pertinent in every case, and "most are subsumed within the basic criterion that the time expended and the rate charged be reasonable." *Hampton Courts*, 599 A.2d at 1115 n. 8; *see Ungar*, 535 A.2d at 890 (the trial court ordinarily explains how it arrived at its award of attorneys' fees, although "a precise analysis ..., utilizing each of the *Frazier* factors, is not required.").

Here, the trial court specifically stated, in awarding fees and costs, that it was employing the lodestar method, and that in doing so, it was "determin[ing] the appropriate hourly rate to be applied to the attorneys' work and multiply[ing] that rate by the number of hours billed." The trial judge also noted that "[t]he attorney's experience is a key factor, and is determined by resort to the 'Laffey Matrix.'" *See Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C.1983), *rev'd in part on other grounds*, 746 F.2d 4 (D.C.Cir.1984). Following this statement, the trial court set forth its award, breaking it down by attorney, hourly rate, and hours worked, with a final calculation of fees earned per attorney during a specified time period. The trial judge explained that "[t]he calculation of the number of hours for each attorney/paralegal is based upon the Court's review of the Statement of Professional Services [ ] and Declaration of Mi-

chael J. Hoare [ ] attached to the Plaintiff's Motion for an Award of Costs and Attorneys' Fees, and the Praecipe." In doing so, the trial court adjusted the attorneys' fee request by lowering the final amount from $502,330.50, as was requested by Stamenkovic, to $443,874.50, a difference of $58,456. This adjustment was based on the *Laffey* matrix's varying annual rate for the hours worked in each year between 2003 and 2009, whereas Stamenkovic's trial attorneys had calculated the attorneys' fees by applying the rate in 2008–2009 to all hours worked between 2003 and 2009. It is therefore not true, as appellants claim, that the trial court did not provide any explanation for the award of fees and costs.

The record indicates that the trial court was fully briefed on the issue of attorneys' fees, as appellants and appellee filed extensive motions that discussed in detail the fees being requested. The trial court reviewed the motions and the attached memoranda, applied the appropriate calculation methods, and, after making a downward adjustment on the fee request, ultimately determined that the appropriate award was $443,874.50 in attorneys' fees and $11,865 in costs. Based on the record and the trial court's determination, we cannot say it abused its discretion. *See Watkins v. District of Columbia*, 944 A.2d 1077, 1084 n. 5 (D.C.2008) (finding that "short order referencing [defendant's] motion [for fees], the District's opposition, and 'the record herein'" was sufficient to "satisf[y]" this court); *Ungar v. District of Columbia Rental Housing Comm'n*, 535 A.2d 887 (D.C.1987) (upholding award of fees where hearing examiner's explanation was less than a paragraph long, but where the "statement of reasons underlying his decision, in conjunction with the findings supporting those reasons," was sufficient).

Because we conclude that the trial court did not commit any reversible error, we affirm the trial court's judgment.

*Affirmed.*