*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CV-534, 19-CV-642, & 19-CV-643

EHAB ANWAR ASAL ET AL., APPELLANTS,

v.

FAYEZ F. MINA, AS ADMINISTRATOR AND LEGAL REPRESENTATIVE OF THE ESTATE OF GEORGE FAYEZ MINA, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAB-9125-15)

(Hon. William M. Jackson, Trial Judge)

(Argued January 7, 2020                    Decided March 18, 2021)

*Patricia Lambert*, with whom Brian Cathel and Emily Devan were on the brief, for appellants Ehab Asal and Hala Asal.

*Laura Basem Jacobs* for appellant Nationwide Property & Casualty Insurance Co.

*Peter Scherr*, with whom Scott Futrovsky was on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and RUIZ, *Senior Judge*.

Opinion by Associate Judge THOMPSON, dissenting in part, at page 50.

BLACKBURNE-RIGSBY, *Chief Judge*: In this appeal, we address the rights and respective duties of drivers and pedestrians when crossing at unsignalized

crosswalks. It arises from a jury verdict finding Ehab and Hala Asal liable for the death of George F. Mina after he was struck by the Asals' vehicle. The Asals appeal the trial court's directed verdict on the issues of negligence and contributory negligence in favor of Mr. Mina's estate, as well as its decision to leave undisturbed the jury's $275,000 non-economic damages award on the survival action. Nationwide Property & Casualty Insurance Co. ("Nationwide"), the Asals' auto insurer, appeals the trial court's ruling that Mr. Mina's estate is entitled to garnish the benefits of the Asals' insurance policy. Finding no error, we affirm.

## I. Background

In June 2015, driver Ehab Asal struck and killed pedestrian George F. Mina. Mr. Mina's father, Fayez Mina, acting as the personal representative of Mr. Mina's estate (the "Estate"), filed a complaint against Mr. Asal and his wife, Hala Asal, alleging, in relevant part, claims under the District of Columbia's Survival Act, D.C. Code § 12-101 (2012 Repl.), and Wrongful Death Act, D.C. Code § 16-2701 (2012 Repl.).[1] A one-day jury trial was held on November 15, 2017, which established largely undisputed facts, as the collision was caught on video camera.

---

[1] At the time of the collision, Mr. Asal was driving a car owned by his wife, Ms. Asal. The Estate named Ms. Asal as a defendant because she owned the car, not because of her involvement in the collision.

## A.    Factual Background

The following facts are derived from the trial testimony, which was corroborated by the surveillance footage viewed by the trial court and the jury.  On June 10, 2015, at approximately 5:06 p.m., Mr. Mina waited in the bus lane inside the crosswalk on the southeast corner of Wisconsin Avenue and Veazey Street NW to cross Wisconsin Avenue.  Wisconsin Avenue is a busy, six-lane roadway with three northbound and three southbound lanes of traffic.  At Veazey Street, an unsignalized crosswalk divides Wisconsin Avenue, with several pedestrian crossing signs facing drivers in both directions – including a sign in the middle of Wisconsin Avenue; the intersection does not have a stop sign.  Emma Rigney, who was driving a red SUV northbound in the middle lane on Wisconsin Avenue, testified that she stopped just before the crosswalk to let Mr. Mina cross.  The two made eye contact, Mr. Mina smiled and waved, and he proceeded to cross.  While walking past Ms. Rigney's stopped car, Mr. Mina turned his head and attention away from the oncoming northbound lanes (the direction of Ms. Rigney's car) and toward the opposite, southbound lanes to observe oncoming traffic.  He then turned his attention back, to observe the innermost northbound lane.  At that time, Mr. Asal's vehicle, which was proceeding in that lane, collided with Mr. Mina.  Mr. Mina's body hit the

side of Mr. Asal's car, his head hit the windshield, and he was thrown five to six feet onto the pavement, where he lost consciousness.

Mr. Asal testified that he knew the area well because he passed through it every day driving to his job at a restaurant located approximately four blocks from the intersection. He was also aware of the crosswalk at that location and that it was marked by several pedestrian warning signs facing his direction. Approaching Veazey Street at the time of the collision, Mr. Asal was driving northbound in the left, innermost northbound lane of Wisconsin Avenue at approximately twenty to thirty miles per hour. Mr. Asal observed Ms. Rigney's car (in the middle northbound lane) slow down as it approached the crosswalk, but testified that he did not see her car stop.[2] The car immediately in front of Mr. Asal in his lane and an oncoming southbound car both drove through the intersection without stopping. Mr. Asal testified that he did not see a pedestrian in the crosswalk, and he did not slow down or stop at the crosswalk. Mr. Asal testified that he did not see Mr. Mina until the collision, when Mr. Mina struck his windshield.

---

[2] Mr. Asal testified that, in his experience, cars that were slowing down as they approached the intersection were generally turning, not stopping. On cross-examination, however, Mr. Asal confirmed that there was no street sign that authorized a car to turn right from the middle lane and that he did not observe Ms. Rigney with her right turn signal on at the time.

Dr. John Davitt, a medical resident at Washington Hospital Center, testified that he was sitting at a restaurant adjacent to the crosswalk when he heard the collision and saw Mr. Mina being tossed from Mr. Asal's car onto the pavement. Dr. Davitt immediately went to the crosswalk, where he found Mr. Mina bleeding, unconscious, and unarousable, though breathing and with a pulse. Dr. Davitt stabilized Mr. Mina's head and neck while waiting for an ambulance to arrive.

An ambulance transported Mr. Mina to the George Washington University Hospital emergency room. Dr. Babak Sarani, Mr. Mina's treating physician and the Estate's expert witness, testified that Mr. Mina was "radioed [in] as being unconscious" and confirmed that he was "in a very deep state of coma" upon his arrival at the emergency room. Dr. Sarani rated Mr. Mina a three on the Glasgow coma scale, the lowest score, indicative of "a deeply comatose person."[3] Dr. Sarani testified regarding the extent of Mr. Mina's injuries and the

---

[3] Dr. Sarani explained that the Glasgow coma scale "is a means of measuring someone's degree of coma" – "how awake are you versus how . . . deep a coma are you in." The score ranges from three to fifteen, with the lowest score, representing a deeply comatose person, being a three. *See also Clements v. United States*, 669 A.2d 1271, 1274 (D.C. 1995) (describing the Glasgow Coma Scale as a "measurement of [the] degree of alertness" that "rat[es] a person between a high of 15 and a low of 3").

medical procedures and therapies he underwent following his arrival at the hospital.[4]

Mr. Mina died on June 16, 2015, six days after the collision. Dr. Sarani testified that

Mr. Mina was unconscious from the moment he arrived at the hospital until he died.

## B.     Judgment in Favor of the Estate

At the close of evidence, the trial court granted the Estate's motion for a

directed verdict on the issues of Mr. Asal's negligence and Mr. Mina's contributory

negligence. As to negligence, the trial court ruled that Mr. Asal – knowing there

was a pedestrian warning sign and seeing Ms. Rigney's car slow down (if not stop)

– had a duty to stop and did not. As to contributory negligence, the trial court ruled

that, once Ms. Rigney's vehicle stopped to allow Mr. Mina to cross, Mr. Mina did

not have a continuing obligation to expect wrongful conduct by other vehicles, i.e.,

that they would drive through the intersection while he was using the crosswalk.

Thus, the only issue remaining for the jury was non-economic compensatory

---

[4] Over defense objection, Dr. Sarani testified that Mr. Mina underwent several emergency surgeries, in which surgeons removed portions of Mr. Mina's skull to extract a blood clot and alleviate pressure in the brain. While those procedures were initially successful, Mr. Mina's brain began to experience internal bleeding and increasing internal pressure. Because surgery was no longer an option, doctors treated Mr. Mina by medicating him with sedatives, and then cooling his body by circulating ice-cold water into his veins and rewarming his body. Mr. Mina's body ultimately went into multiple organ failure.

damages, e.g., for pain and suffering. The jury awarded the Estate a total of $801,779.30 in damages, including an award of $275,000 in non-economic damages in the survival action. The trial court entered judgment that same day, November 15, 2017.

Following the entry of judgment, the Asals, on December 12, 2017, moved for a new trial, arguing that the trial court erred in not submitting the issue of contributory negligence to the jury, or, in the alternative, for remittitur of the non-economic damages award because the $275,000 award was not supported by the evidence. The Asals also filed a motion to stay the execution of judgment pending a decision on the motion for a new trial. The Estate opposed and responded with a cross-motion, requesting as a condition for a stay that the Asals post adequate security through a bond, pursuant to Super. Ct. Civ. R. 62. On May 3, 2018, the trial court entered separate orders that, in relevant part, (1) denied the Asals' motion for a new trial, and (2) granted the Estate's cross-motion, requiring that the Asals post a $808,226.00 bond as adequate security for a stay by June 4, 2018.[5] The Asals timely appealed those orders.[6]

---

[5] The $808,226.00 amount comprised the $801,779.30 judgment, plus previously-awarded sanctions of $6,446.70.

[6] This court denied the Asals' emergency motion to stay the execution of judgment.

### C.     Nationwide's Dispute Regarding the Asals' Insurance Policy

The Asals maintained a Personal Auto Policy with Nationwide (the "Policy"). Nationwide delivered the Policy to the Asals in Virginia for a vehicle they owned in Virginia.  The relevant parts of that Policy provided as follows.  Pursuant to Part B ("Liability Coverage"), Nationwide agreed to "pay damages for bodily injury . . . for which any insured becomes legally responsible because of an auto accident" up to an applicable limit of $200,000, all defense costs incurred in settling or defending any claim or suit, and "[p]remiums on appeal bonds and bonds to release attachments in any suit" that Nationwide defends.  Pursuant to Part E ("Duties After an Accident or Loss"), Nationwide may deny Liability Coverage under Part B "if failure to comply with the following duties is prejudicial to us," including the duty to "[c]ooperate with [Nationwide] in the investigation, settlement, or defense of any claim or suit."  Part F provided:

> No legal action may be brought against us [Nationwide] until there has been full compliance with all the terms of this policy. In addition, under Part B, no legal action may be brought against us until:
>
> 1. We agree in writing that the insured has an obligation to pay; or

2. The amount of that obligation has been finally determined by judgment after trial. If that judgment is returned unsatisfied, legal action may then be maintained against us for the amount of the obligation that does not exceed the limits of applicable coverage under this policy.

Pursuant to the Policy, Nationwide paid all of the Asals' defense and appeal costs in this matter.

On June 7, 2018, the Asals filed a motion to clarify the trial court's order of May 3, 2018, which required them to post a $808,226.00 bond by June 4, 2018. In their motion, the Asals asserted that Nationwide "indicated that it will not provide collateral for a bond in an amount over $200,000, which is the limit of the applicable insurance policy." Without providing any justification, the trial court declined to clarify its prior order.

Neither the Asals nor Nationwide posted the required bond or paid any of the judgment. Therefore, on September 18, 2018, the Estate filed a writ of attachment against Nationwide in an effort to seize the proceeds of the Asals' insurance policy, and served interrogatories on Nationwide. Nationwide answered the interrogatories attached to the writ, denying that it possessed any property belonging to the Asals. Thereafter, the Estate filed a motion for judgment of condemnation against the Asals and Nationwide, asserting that the Estate, as the prevailing party in the underlying

suit, became a judgment creditor under the Policy and therefore subrogated to the Asals' right of indemnification, which required Nationwide to remit the $200,000 Policy limit to the Estate. In opposition, Nationwide asserted that (1) the benefits of the Policy were not the property of the Asals and therefore not obtainable through a writ of attachment; and (2) Nationwide had no obligation to pay *any* amount until after the conclusion of the appeals process because, under the cooperation clause in Part E of the Policy, determining the insured's compliance with the obligation to cooperate can "be made only after the conclusion of the litigation process, including the appeal and further trial."

After a January 18, 2019, hearing, the trial court granted the Estate's motion and entered a judgment of condemnation against the Asals and Nationwide for $200,000. In granting the motion, the trial court, finding no controlling law in the District, relied on *Peninsula Ins. Co. v. Houser*, 238 A.2d 95, 97 (Md. 1968), which holds that a judgment creditor is entitled to the same financial and legal rights as the judgment debtor under an automobile liability insurance policy. Therefore, the trial court ruled that the Estate was entitled to collect on and garnish the Asals' Policy up to its limit at the time of the November 15, 2017, judgment because, on that date, "the Asal's [*sic*] status changed from Defendants to judgment debtors and

Nationwide from interested party to garnishee." Both Nationwide and the Asals appeal from that order.[7]

## II. Negligence

The trial court did not err in its decision to direct a verdict as to Mr. Asal's negligence. The Asals contend that the trial court should have allowed the issue of negligence to go to the jury because there was some evidence that Mr. Asal's failure to stop at the crosswalk, as required by D.C. Code § 50-2201.28(a-1) (2014 Repl.), was "excusable," thereby defeating a finding of negligence per se and that the jury should have had the opportunity to weigh Mr. Asal's reasons for failing to stop.[8]

In reviewing the grant of a directed verdict, we use the same test applied by the trial court, viewing the evidence in the light most favorable to the non-moving

---

[7] Although the Asals' appeal was docketed in this court as case No. 19-CV-642, no parties filed any briefs or documents under that case number. Nationwide's appeal, No. 19-CV-643, was fully briefed before this court, and we decide the merits of the issues in both appeals as presented in those briefs.

[8] D.C. Code § 50-2201.28(a-1) provides that "[w]henever a vehicle is stopped at a marked crosswalk at an unsignalized intersection, a vehicle approaching the crosswalk in an adjacent lane or from behind the stopped vehicle shall stop and give the right-of-way to ensure the safety of pedestrians and bicyclists before passing the stopped vehicle."

party and drawing all inferences in its favor. *See Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1170 (D.C. 2008); *Wilson v. Wash. Metro. Area Transit Auth.*, 912 A.2d 1186, 1188 (D.C. 2006); *Abebe v. Benitez*, 667 A.2d 834, 836 (D.C. 1995) (per curiam). "As long as there is some evidence from which jurors could find that the party has met its burden, a trial judge must not grant a directed verdict." *Abebe*, 667 A.2d at 836. Thus, a trial court presiding over a jury trial may direct a verdict against a party only if it "has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for" that party. *Evans-Reid v. District of Columbia*, 930 A.2d 930, 936 (D.C. 2007). "This court considers de novo whether the evidence was sufficient to go to the jury." *Wilson*, 912 A.2d at 1188 (emphasis omitted).

Where a person's violation of a statute proximately causes an injury that the statute was designed to prevent, "there is a rebuttable presumption of negligence on the part of the violator," i.e., negligence per se. *Robinson v. District of Columbia*, 580 A.2d 1255, 1256 (D.C. 1990). If the violator demonstrates that he or she did "everything a reasonably prudent person would have done to comply with the law," then the statutory violation merely constitutes evidence of negligence. *Id.* Here, the trial court ruled that Mr. Asal was negligent when he failed to stop for Mr. Mina, "not merely from violation of the statute, but from the facts that have been introduced

thus far," i.e., finding liability as to both negligence per se and negligence. Thus, while Mr. Asal contends that the jury should have been permitted to consider his *reasons* for failing to stop and thereby evaluate whether his conduct was negligent, it is clear that the trial court evaluated Mr. Asal's reasons for failing to stop and nevertheless determined that he was negligent as a matter of law. Thus, the trial court directed a verdict as to both negligence and negligence per se.

On appeal, the Asals argue that Mr. Asal did not comply with D.C. Code § 50-2201.28 because he thought Ms. Rigney was "merely turning," based on "what he observed and his experience driving regularly in the area." However, they advance no explanation as to why Mr. Asal's reasons for failing to stop demonstrate that he "did everything a reasonably prudent person would have done to comply with the law." *Robinson*, 580 A.2d at 1256. Mr. Asal testified that he believed Ms. Rigney was going to make a right turn despite his testimony that she was in the center lane of traffic, that there was no street sign that authorized her to turn right from the middle lane, and that he did not observe her as having her right turn signal on. Thus, all that is left is what the Asals argue is Mr. Asal's "experience." *See supra* note 2. However, the record provides no evidence that Mr. Asal regularly observed vehicles making right turns from the middle lane of traffic or that it was the regular practice at that intersection; he only testified that the right lane is a "bus

stop."[9]  On this record, there is no legally sufficient evidentiary basis for a jury to conclude that Mr. Asal's reasons for failing to stop excused his violation of  D.C. Code § 50-2201.28, such that the issue of negligence should have gone to the jury. *See Evans-Reid*, 930 A.2d at 936.  Therefore, we find no error in the directed verdict on Mr. Asal's negligence.

### III.  Contributory Negligence

The Asals argue that the trial court erred in directing a verdict for the Estate on the issue of contributory negligence, rather than submitting the issue to the jury. We find no such error.  For the reasons explained below, we hold that a pedestrian has a duty to exercise reasonable care for the protection of his or her own safety, even when he or she has the right-of-way at an unsignalized intersection or crosswalk.  We conclude that the evidence, viewed in the light most favorable to the Asals and drawing all inferences in their favor, was insufficient to support any finding by a reasonable jury that Mr. Mina was contributorily negligent, i.e., that he

---

[9] Mr. Asal testified that, at the time of the collision, there were no cars parked along the right-hand side of the street.  The video footage corroborates that the right lane was empty of cars, and it also shows that there was no bus coming to or at that bus stop in the twenty-five seconds preceding his collision with Mr. Mina.

engaged in conduct that was unreasonable under the circumstances. Therefore, the trial court properly directed a verdict in favor of the Estate on that issue.[10]

### A. A Pedestrian's Duty of Reasonable Care

Having considered the principles of contributory negligence, our jurisprudence in pedestrian-vehicle collision cases, and the relevant statutory and regulatory framework, we clarify that in all circumstances a pedestrian has a "duty to exercise reasonable care for the protection of his or her own safety." *Lyons v. Barrazotto*, 667 A.2d 314, 322 (D.C. 1995); *see also* Standardized Civil Jury Instructions for the District of Columbia, No. 7.13 (2020 Rev. Edition) ("Before attempting to cross a street, it is a pedestrian's duty to make reasonable observations to learn the traffic conditions confronting him or her, and try to make a sensible

---

[10] We are not persuaded by the Estate's argument that the Asals waived a contributory negligence defense. The Asals asserted contributory negligence as an affirmative defense in their Answer, raised the defense during the deposition of Mr. Asal, and addressed it in the Joint Pre-Trial Statement by requesting a jury instruction for "Contributory Negligence Defined" and proposing a verdict sheet with a contributory negligence instruction. Because the Estate was sufficiently on notice of the defense, we conclude that it was not waived. *Cf. Word v. Ham*, 495 A.2d 748, 751 (D.C. 1985) (per curiam) ("Appellees were put on notice of the defense by appellants' opposition to their motion for summary judgment and had the opportunity to respond, and thus cannot claim to have been prejudiced by appellants' failure to plead this defense in their answer or counterclaim.").

decision whether it is reasonably safe to attempt the crossing."). Here, we hold that a pedestrian has a duty to exercise reasonable care when crossing at an unsignalized intersection or crosswalk, even when he or she has the right-of-way. Thus, contributory negligence plays a role in determining liability in negligence cases involving pedestrians, even when the pedestrian has the right-of-way. We reject the Estate's argument that a pedestrian, once legally crossing within the crosswalk, has "no duty to continually observe for traffic which was legally required to stop in advance of the crosswalk."

i.  *Contributory Negligence Principles*

In the District, a plaintiff in a negligence action generally cannot recover when he or she is found to have been contributorily negligent. *See Civic v. Signature Collision Ctrs., LLC*, 221 A.3d 528, 530 (D.C. 2019).[11] Contributory negligence evaluates "the objective reasonableness of the plaintiff's conduct," determining whether "the plaintiff's behavior in encountering the risk [created by the defendant's

---

[11] The District remains one of the few jurisdictions that generally retains a pure contributory negligence defense. *See, e.g.*, *Jarrett v. Woodward Bros.*, *Inc.*, 751 A.2d 972, 985 & n.20 (D.C. 2000) (noting that the District is different from the "great majority of jurisdictions," most of which "have some sort of comparative negligence regime"). But see *infra* note 12. Even a contributorily negligent plaintiff may recover if the defendant had the "last clear chance" to avoid the injury. *District of Columbia v. Huysman*, 650 A.2d 1323, 1326 (D.C. 1994).

breach of duty] departed from the standard of care that is to be expected of the reasonable person in the plaintiff's position." *Sinai v. Polinger Co.*, 498 A.2d 520, 524 (D.C. 1985). "As a general proposition, a plaintiff is not bound to anticipate negligent conduct on the part of others. Rather, he may assume that others will fulfill their duties." *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) (citation omitted).

ii.  *Relevant Jurisprudence*

This court has not had occasion to consider a pedestrian's duty when crossing the street in the case of a pedestrian-vehicle collision. Our predecessor courts, however, provide sufficient guidance from which we can discern relevant principles.

*Griffith v. Slaybaugh*, 29 F.2d 437 (D.C. Cir. 1928), is one of the earliest relevant decisions and dealt with a signalized crosswalk. In *Griffith*, two pedestrians, "walking rapidly," began crossing when the signal was green, thus authorizing their passage; as they crossed, the light changed to red, and a car traveling perpendicular through the intersection struck them. *Id.* at 437-38. The court affirmed a judgment in favor of the pedestrians. *Id.* at 439. After reviewing

the relevant traffic regulations, the court identified the following as a "clear expression of the law":

> [O]ne entering the street intersection under the direction of the traffic officer has the right of way and this right of way continues until he reaches the other side of the street, and the fact that the semaphore was changed, giving the traffic in the other direction notice to proceed, does not give them the right of way over the one first entering the street crossing, and the one first entering has the right to presume that he can pass over in safety and is not required to exercise continuous and extra observation to avoid vehicles using such street.

*Id.* at 438 (quoting *Riddel v. Lyon*, 213 P. 487, 489 (Wash. 1923)).  As the court noted, the pedestrian in a crosswalk always has the right of way, except where there is a traffic signal, in which case the pedestrian has "the right of way along with other traffic moving in observance with the traffic signals." *Id*.  Under the facts of *Griffith*, where plaintiffs had a green light when they began to cross the street, the court noted that "[c]learly there was no contributory negligence on the part of the plaintiffs, since they were where they had a right to be and were diligently using their best efforts to clear the street." *Id.*

Thereafter, in *American Ice Co. v. Moorehead*, 66 F.2d 792, 793-94 (D.C. Cir. 1933), the court affirmed a verdict in favor of a pedestrian in a pedestrian-vehicle collision.  The pedestrian was crossing at an unsignalized crosswalk when a truck

struck her. *Id.* at 792-93. The court noted that, because the applicable traffic regulation gave the pedestrian the right-of-way while in the crosswalk, she "had the right . . . to assume that the driver . . . would exercise reasonable care to look out for and avoid injuring a pedestrian attempting to cross the street." *Id.* at 793. It held that there was no error in the trial court giving a contributory negligence instruction because there was "some conflict" as to whether the pedestrian, who was walking with her husband, was within the lines demarcating the crosswalk. *Id.* at 793-94. The contributory negligence instruction informed the jury that they were to determine the pedestrian's "omission to do anything which a reasonable person, guided by those ordinary considerations which regulate human conduct, would do in the circumstances." *Id.* The jury concluded that the pedestrians were in the crosswalk – "were where they had a right to be" – and thus the "danger arose only as a result of the negligent conduct of [the] driver." *Id.* at 793.

Relatedly, in *Miller v. Clark*, 109 F.2d 677, 677-78 (D.C. Cir. 1940), the court affirmed the trial court's denial of a driver's motion for a directed verdict on the issue of a pedestrian's contributory negligence. The pedestrian in *Miller* looked both ways as she entered a crosswalk, "saw her way clear," began crossing the street, and was hit by a truck. *Id.* at 677. The court concluded that the "evidence support[ed], if . . . not require[d], the inference that [the pedestrian] was free from contributory

negligence." *Id.* The court noted that it may have been "possible, notwithstanding [the driver's] negligence, [that] the greatest of care on [the pedestrian's] part might have prevented the accident; but she was, of course, required to use only reasonable care." *Id.* at 677-78. It elaborated that "reasonable care did not necessarily require [the pedestrian], before or after entering the crosswalk, to look again up [the street] on the chance that a negligent driver might approach swiftly and without warning from around the corner." *Id.* at 678.

Finally, in *Long v. Mercer*, the court affirmed the trial court's denial of a driver's motions for directed verdicts as to a pedestrian's contributory negligence. 125 A.2d 685, 687 (D.C. 1956). The pedestrian began crossing the street while the traffic light controlling her passage was green. *Id.* at 686. While the pedestrian was still crossing, the light changed to red; although several cars waited to allow the pedestrian to complete passage, the defendant-cab driver did not and struck the pedestrian. *Id.* The driver argued that the pedestrian "failed to exercise reasonable care for her own safety after the light had changed to red against her," urging that she "had a duty under the circumstances to look to her right and to do so observantly and with effect; that is to see what was there to be seen." *Id.* The court noted that it was "a reasonable inference" under the facts of the case – approaching nightfall, crowded traffic, the pedestrian's need to watch her footing, and the conduct of other

cars that had stopped – that the pedestrian "became aware of defendants' taxicab as soon as could be expected of any reasonably prudent person." *Id.* at 687. Even though the pedestrian had the right-of-way, "watchfulness in several directions was required of plaintiff for her own safety." *Id.* However, "the fact that she did not see the taxicab although it 'was there to be seen' does not . . . indicate contributory negligence as a matter of law." *Id.*

These cases establish that pedestrians always have a duty to use *reasonable* care for the protection of their own safety and that of others, even when they have the right-of-way while using a crosswalk. That right-of-way, however, is determined by the applicable statutes and regulations governing pedestrian and driver conduct, and it further informs whether conduct in a particular case is reasonable. Thus, we must review that legal framework before espousing general principles (see *infra* Section II.A.iii) and before applying it to the facts of this case (see *infra* Section II.B).

### iii.    *Statutory and Regulatory Framework*

The District's statutory and regulatory framework establishes a pedestrian's right-of-way in certain circumstances, and we discuss the framework that is

applicable to unsignalized intersections and crosswalks. The only statutory provision is D.C. Code § 50-2201.28 ("Right-of-way at crosswalks"), which, in relevant part, reads:

> (a) The driver of a vehicle shall stop and remain stopped to allow a pedestrian to cross the roadway within any marked crosswalk, or unmarked crosswalk at an intersection, when the pedestrian is upon the lane, or within one lane approaching the lane, on which the vehicle is traveling or onto which it is turning.
>
> (a-1) Whenever a vehicle is stopped at a marked crosswalk at an unsignalized intersection, a vehicle approaching the crosswalk in an adjacent lane or from behind the stopped vehicle shall stop and give the right-of-way to ensure the safety of pedestrians and bicyclists before passing the stopped vehicle.

Applicable regulations reinforce the statutory right-of-way of a pedestrian in an unsignalized crosswalk. For example, 18 DCMR § 2208.12 (2020) requires vehicles to "give the right-of-way to a pedestrian" within marked or unmarked crosswalks at intersections without traffic-controlled signals; § 2208.4 and 2208.6 require vehicles at stop and yield signs to "yield the right-of-way to pedestrians"; and § 2221.5 (2020) partially reiterates the requirements of subsection (a-1) of the statute. This framework identifies a pedestrian's right-of-way in terms of the driver conduct

required, yielding so the pedestrian can cross safely.[12]   As the *Griffith* court explained, a pedestrian crossing in an unsignalized crosswalk always has the right of way because he or she lacks the additional protections offered by traffic signals and is therefore more exposed to the "dangers attending [the use of automobiles] upon the public highway."  29 F.2d at 439.

One of the few regulatory provisions directed at pedestrian conduct, rather than driver conduct, is 18 DCMR § 2303.2 (2020), which states that a pedestrian may not "suddenly leave a curb . . . or other designated place of safety and walk or turn into the path of a vehicle which is so close that it impossible for the driver to yield" – thereby prohibiting a pedestrian from engaging in conduct that contravenes his or her "responsibility to exercise due care for his [or her] own safety."  *Garcia v. Bynum*, 635 F. Supp. 745, 747 (D.D.C. 1986) (granting defendant-driver's motion notwithstanding the verdict in pedestrian-vehicle collision case where plaintiff-pedestrian "walked out from between two unmarked cars in the middle of the block," "in a relatively darkened area," "knowing that a car was approaching a yellow light

_____

[12] The District's statute and regulations governing conduct at signalized intersections similarly regulate a driver's conduct.  *See* D.C. Code § 50-2201.28(b) (requiring a driver to "give[] the right-of-way" to a "pedestrian who has begun crossing on the 'WALK' signal . . . to continue to the opposite sidewalk or safety island, whichever is nearest"); 18 DCMR § 2208.11 (same); 18 DCMR § 2302.2 (2020) ("Pedestrians facing a 'WALK' signal may proceed . . . and shall be given the right-of-way by the drivers of all vehicles.").

not far from him"), *aff'd* 816 F.2d 791 (D.C. Cir. 1987). *Garcia* did not involve a crosswalk, however, so the obligations on the driver that are incident to the pedestrian's right of way did not come into play in evaluating the reasonableness of the pedestrian's conduct. *See id.*

iv. *Legal Standard*

In light of the above authorities, we hold that pedestrians crossing at an unsignalized intersection or using a crosswalk always have a duty to use reasonable care for the protection of their own safety and that of others, even when they have the right-of-way. We find no support for the argument advanced by the Estate that a pedestrian with the right-of-way has no continuing duty to act reasonably and, therefore, cannot be barred from recovery as a result of his or her contributory negligence. Rather, the case law and the statutory and regulatory scheme establish that a pedestrian's negligent conduct, even when he or she has the right-of-way, may bar his or her recovery for a driver's negligence.[13]

---

[13] Further informing our holding is the recently-passed Motor Vehicle Collision Recovery Act of 2016, D.C. Law 21-167, § 3, 63 D.C. Reg. 12592 (2016), enacted after the events herein, which limits the application of contributory negligence to pedestrians involved in pedestrian-vehicle collisions to cases in which the pedestrian's "negligence is . . . [g]reater than the aggregated total amount of negligence of all of the defendants that proximately caused" the pedestrian's injuries.

The case law affirms that pedestrians always have a duty to act reasonably, even when they have the right-of-way. *See, e.g.*, *Long*, 125 A.2d at 687 (noting that "watchfulness in several directions was required of [pedestrian] for her own safety," despite her right-of-way). A pedestrian's duty, however, is only to act reasonably under the circumstances. A pedestrian need not exercise the "greatest of care," *Miller*, 109 F.2d at 678, or "continuous and extra observation to avoid vehicles," *Griffith*, 29 F.2d at 439, even if such prudent conduct may have avoided a collision altogether. Moreover, to act reasonably, a pedestrian need not anticipate or act in such a way that assumes wrongful conduct of others. To the contrary, a pedestrian may rely on his or her reasonable expectations of lawful conduct by others. *See Stager*, 494 A.2d at 1311 ("[A] plaintiff is not bound to anticipate negligent conduct on the part of others. Rather, he may assume that others will fulfill their duties."); *Griffith*, 29 F.2d at 438 (noting that a pedestrian with the right-of-way has a "right to presume that he can pass over in safety").

---

D.C. Code § 50-2204.52(a) (2012 Repl. & 2020 Supp.). The statute acknowledges that a pedestrian's contributory negligence, regardless of right-of-way, can bar his or her recovery in a pedestrian-vehicle collision when the pedestrian's negligence is greater than that of the driver.

The facts of a particular case determine whether a pedestrian's conduct may give rise to a contributory negligence instruction. On the one hand, evidence that a pedestrian did not see a vehicle "although it was there to be seen" does not, alone, establish an inference of contributory negligence. *Long*, 125 A.2d at 687 (internal quotation marks omitted).[14] For example, a contributory negligence instruction is not warranted when a pedestrian, after looking both ways to cross the street, does not again look up the street "on the chance that a negligent driver might approach swiftly and without warning from around the corner." *Miller*, 109 F.2d at 678. On the other hand, a pedestrian's conduct that deviates from what is reasonable or does not conform to his or her right-of-way may support an instruction of contributory negligence. *See, e.g.*, *Moorehead*, 66 F.2d at 793-94 (noting "some conflict" as to whether pedestrian was within the lines demarcating the crosswalk and concluding that there was no error in the trial court's contributory negligence instruction).

Whether conduct is reasonable is, of course, informed by whether a pedestrian has the right-of-way and, as a consequence, the conduct he or she reasonably

---

[14] A contrary rule would be antithetical to the fault-based principles of contributory negligence because it would exonerate the driver in virtually every case as, save few exceptions, whenever there is a collision with a car, the vehicle will logically be there to be seen. Contributory negligence is not determined by whether the pedestrian was physically able to see the vehicle, but whether the pedestrian should be faulted for not adverting the danger it presented and acting to prevent it.

assumes of surrounding drivers. The District's statutory and regulatory framework delineates a pedestrian's right-of-way indirectly by affirmatively regulating driver conduct. *See, e.g.*, D.C. Code § 50-2201.28(a) and (a-1) (requiring that drivers "shall stop" at intersections and give pedestrians the right-of-way in certain circumstances); 18 DCMR §§ 2208.4, 2208.6, 2221.5 (same). Therefore, a pedestrian acts reasonably when he or she engages in conduct that comports with these statutorily- and regulatorily-required driver obligations. While such a right-of-way may inform a pedestrian's conduct in certain circumstances, it does not absolve the pedestrian of his or her continuing obligation to act reasonably. A right-of-way does not excuse negligent conduct. *Cf. Capital Trans. Co. v. Smallwood*, 162 F.2d 14, 15 (D.C. Cir. 1947) ("Possession of the technical right[-of-way] to precedence does not justify negligent insistence upon it.").[15]

---

[15] The relevant standard civil jury instruction adequately conveys the above-outlined principles:

> Before attempting to cross a street, it is a pedestrian's duty to make reasonable observations to learn the traffic conditions confronting him or her, and try to make a sensible decision whether it is reasonably safe to attempt the crossing. [The law does not regulate the specific observations he or she should make, and what he or she should do for his or her own safety, while crossing the street. The law does, however, place upon the pedestrian the continuing duty to exercise ordinary care to avoid an accident.]

In sum, we hold that a pedestrian has a duty to act reasonably, even when he or she has the right-of-way while crossing at an unsignalized intersection or while using a crosswalk. A pedestrian must exercise reasonable care, and a contributory negligence instruction is not warranted merely because a pedestrian did not use the greatest of care. Rather, a pedestrian acts reasonably when his or her conduct comports with the statutory and regulatory right-of-way obligations required of both pedestrians and drivers. If a pedestrian's conduct comports with such obligations, a contributory negligence instruction will usually not be warranted. However, because a right-of-way does not excuse the obligation to act with reasonable care under the circumstances, a contributory negligence instruction may be justified when conduct could be found to deviate from what was reasonable, taking account of all the facts, including expectations based on the parties' right-of-way obligations.

**B.     Mr. Mina was not contributorily negligent.**

The Asals argue that Mr. Mina's conduct raised a factual issue concerning whether he was contributorily negligent. Reviewing the evidence in the light most

---

Standardized Civil Jury Instructions, No. 7.13 ("Pedestrian's Duty When Crossing Streets").

favorable to the Asals, we conclude that there was no legally sufficient evidentiary basis for a reasonable jury to find that Mr. Mina's conduct did not meet the applicable standard of care. *See Evans-Reid*, 930 A.2d at 936. We thus affirm the trial court's decision to direct a verdict on the issue of contributory negligence.

Typically, negligence and contributory negligence are questions of fact for the jury. *Washington v. A&H Garcias Trash Hauling Co.*, 584 A.2d 544, 545 (D.C. 1990). However, in the exceptional case, the evidence may be "so clear and unambiguous that contributory negligence should be found as a matter of law." *Id.* at 547. The converse also holds, i.e., that the evidence may be so clear that contributory negligence should be negated as a matter of law. When there is "but one reasonable inference which may be drawn from undisputed facts," negligence and contributory negligence "pass from the realm of fact to one of law." *Aqui v. Isaac*, 342 A.2d 370, 372 (D.C. 1975) (per curiam).

The Asals argue that while crossing the street, Mr. Mina "failed to maintain a proper lookout" because, after making eye contact with Ms. Rigney, he turned his head away from the northbound traffic (i.e., the direction from which Mr. Asal was coming) and toward the southbound traffic, and he therefore "failed to observe oncoming traffic as he continued to cross the street." This characterization of the

evidence is undisputed. The question, however, is whether Mr. Mina's failure to continue observing northbound traffic could support an inference that his conduct failed to meet the required standard of care. We see no error in the trial court's conclusion that it could not.

The evidence demonstrates that Mr. Mina waited at the southeast corner of a marked unsignalized crosswalk for cars to stop before attempting to cross. When Ms. Rigney, driving northbound in the middle lane (the direction of traffic closest to Mr. Mina), stopped to allow Mr. Mina to pass, the two made eye contact, and Mr. Mina smiled and waved before he proceeded to cross. After ensuring that Ms. Rigney had stopped to allow him passage, Mr. Mina began crossing and then looked in the opposite direction, toward the southbound lanes, for oncoming traffic. He looked northbound again after passing Ms. Rigney's car, at which point Mr. Asal struck him.

Mr. Mina reasonably conducted himself under the assumption, grounded on statutory and regulatory requirements, that other drivers would fulfill the rights and duties pertaining to his right-of-way. By looking first toward the northbound traffic closest to him, and then turning to look toward the southbound traffic in the farther lanes, Mr. Mina was not derelict in his duty – warranting a contributory negligence

instruction. Section 50-2201.28(a-1) of the D.C. Code requires a driver to stop whenever he or she approaches in an adjacent lane or from behind another vehicle that is stopped "at a marked crosswalk at an unsignalized intersection," thus giving the right-of-way to pedestrians and ensuring their safety. *See also* 18 DCMR § 2221.5. Because Mr. Mina confirmed that Ms. Rigney had stopped, he could reasonably assume that other cars driving northbound in the other lanes would also stop to allow him to pass, as required by § 50-2201.28(a-1). He was walking at a normal pace, using reasonable surveillance – looking both ways – to observe traffic, and not otherwise distracted from his goal of crossing the street. In sum, Mr. Mina was where he had a right to be and used reasonable efforts to safely cross the street. *See Griffith*, 29 F.2d at 438.

That Mr. Mina could have kept his eyes toward the northbound traffic (and thus seen Mr. Asal's car), waited longer to look at the southbound traffic, walked slower, or exhibited even greater care in passing across the northbound lanes of traffic does not create a factual dispute as to whether Mr. Mina's conduct was reasonable. While such conduct may reflect the greatest of care and might have prevented or mitigated the effects of the collision, that is not the required standard. Mr. Mina's conduct need only have been reasonable. *See Long*, 125 A.2d at 687 (finding no contributory negligence as a matter of law even though the vehicle "was

there to be seen"); *Miller*, 109 F.2d at 677-78 (affirming that pedestrian was "required to use only reasonable care," even though it was possible that "the greatest of care on [the pedestrian's] part might have prevented the accident").

We conclude that there was but one reasonable inference to be drawn from these facts. There was no legally sufficient evidentiary basis for a reasonable jury to find that Mr. Mina's conduct breached his duty of care. Therefore, the evidence was clear and unambiguous such that contributory negligence was negated as a matter of law. We find no error in the trial court's directed verdict in Mr. Mina's favor on that issue.

## IV. Non-Economic Damages

We are not persuaded by the Asals' argument that the $275,000 jury award for non-economic damages in the survival action was excessive and should be reversed. The Asals argue that there was no evidence that Mr. Mina experienced any pain and suffering, signaled by an audible indication (e.g., yelling or moaning), in the approximately one-and-a-half seconds between the time Mr. Mina first turned his attention toward Mr. Asal's vehicle and when he lost consciousness, thus

warranting a lower damages award. We disagree that the jury award should be reversed.

We review for abuse of discretion the trial court's grant or denial of a motion for remittitur or new trial for excessiveness of verdict. *See Louison v. Crockett*, 546 A.2d 400, 403 (D.C. 1988). The scope of this review is "especially narrow" because "the trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference given to the jury's determination of such matters of fact as the weight of the evidence." *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 945 (D.C. 2012) (quoting *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008) (internal quotation marks omitted)). "When a party moves to strike a verdict as excessive, the trial court must consider whether that verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements." *Id.* (quoting *Moss v. Stockard*, 580 A.2d 1011, 1013 (D.C. 1990) (internal quotation marks omitted)).

In a survival action, circumstantial evidence is sufficient to support an award for the decedent's pain and suffering. *See Doe v. Binker*, 492 A.2d 857, 861 (D.C. 1985). Such circumstantial evidence can include inferences drawn from the nature of decedent's injuries, eyewitness testimony about the moments before and after the

injuries, and medical expert testimony. *See District of Columbia v. Hawkins*, 782 A.2d 293, 304-05 (D.C. 2001); *Doe*, 492 A.2d at 861. For example, death by "drowning or burning" permits "an inference of conscious pain and suffering." *Doe*, 492 A.2d at 861. In *Doe*, a survival action arising from a fatal automobile collision, this court affirmed a non-economic damages award of $200,000 and concluded that "substantial circumstantial evidence . . . on the issue of pain and suffering" supported the award, specifically testimony from eyewitnesses regarding the moments before and after the collision and from a doctor regarding the cause of the decedent's death. *Id.* In *Hawkins*, another fatal automobile collision case in which the decedent was ejected from her vehicle, landed on concrete, and severed her spinal cord, the decedent experienced pain and suffering for only a few seconds. 782 A.2d at 298, 304-05. There, we affirmed an award of $350,000 in non-economic damages based on the testimony of a medical expert regarding the nature of the decedent's injuries and the fact that she would have experienced pain for less than a minute, as well as the testimony of an eyewitness who described the decedent as being in "a lot of pain." *Id.* at 304-05.

Here, there is substantial circumstantial evidence, similar to the evidence presented in *Doe*, to sustain the non-economic damages award. Testimony from both Mr. Asal and Ms. Rigney, as well as the video footage, conveyed the collision

in graphic detail. Dr. Davitt, present near the scene, saw the aftermath of the collision and described Mr. Mina as bleeding, unconscious, and unarousable. Dr. Sarani, Mr. Mina's treating physician at the emergency room, testified about the gravity of Mr. Mina's injuries, the exhaustive medical procedures that were attempted to revive him, and the cause of his death.[16] The Asals presented no contrary evidence, instead arguing that there was no evidence that Mr. Mina experienced conscious pain and suffering after hitting Mr. Asal's windshield. In light of substantial evidence that Mr. Mina was grievously injured immediately upon being thrown by the impact with the vehicle, as well as inferences drawn from the circumstantial evidence of the nature of Mr. Mina's injuries, we cannot conclude that the $275,000 award resulted from "passion, prejudice, mistake, oversight, or consideration of improper elements" such that it was excessive, *Stamenkovic*, 44 A.3d at 945 (citation omitted), particularly because it falls within the range of awards previously affirmed by this court in evaluating similar circumstantial evidence.

---

[16] The Asals argue that Dr. Sarani's testimony concerning Mr. Mina's injuries and the attempted medical procedures unduly prejudiced the jury, and that this testimony was unnecessary given the parties' stipulations concerning the medical procedures and the amount of medical bills. They imply that the trial court improperly admitted his testimony over objection. First, appellants do not argue that the trial court abused its discretion in permitting the testimony of Dr. Sarani, and therefore that issue is not before us. Second, testimony by doctors concerning the cause of death constitutes "circumstantial evidence . . . on the issue of pain and suffering." *Doe*, 492 A.2d at 861. Therefore, such evidence was properly before the jury to consider in determining an award of non-economic damages.

Because we conclude that the evidence was sufficient to sustain the non-economic damages award, we also conclude that the trial court did not abuse its discretion in denying the Asals' motion for remittitur or for a new trial based on excessive verdict.

## V.     Judgment of Condemnation

Nationwide asserts that the trial court erred in granting the Estate's motion for judgment of condemnation. It argues that the Policy's benefits are not attachable because they are not property of the Asals, specifically in that the benefits are not yet due because the Asals have not fully complied with a condition precedent to payment: the Policy's cooperation clause. We conclude first that an injured party who is successful in an underlying suit may garnish the benefits of the judgment debtor's insurance policy through a writ of attachment. Second, the failure to comply with a cooperation clause, if adequately raised and supported by evidence, serves as an affirmative defense to liability; compliance with a cooperation clause is not, however, a condition precedent to garnishment. For these reasons, we find that the trial court did not abuse its discretion in granting the Estate's motion for a judgment of condemnation.

## A.    Writ of Attachment

In the post-judgment context, a writ of attachment is a means of enforcing a judgment, allowing a judgment creditor "easy access to a debtor's assets," *John C. Flood of Md., Inc. v. Brighthaupt*, 122 A.3d 937, 941-42 (D.C. 2015), i.e., "goods, chattels, and credits," D.C. Code § 16-544 (2012 Repl.).  A judgment creditor can also reach a debtor's assets that are held by a third party, e.g., "in the hands of a garnishee."  D.C. Code § 16-546 (2012 Repl.); *see also Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1351-52 (D.C. 1994).  "Service of the writ on the garnishee creates a valid lien in favor of the judgment creditor on the debtor's property held by the garnishee."  *Smith*, 644 A.2d at 1352.  Obtaining that property, however, requires the judgment creditor and garnishee to comply with certain procedures.  *Id.*

The judgment creditor can recover only by the same right and to the same extent as the judgment debtor because the creditor merely steps into the shoes of the debtor.  *See, e.g.*, *Smith*, 644 A.2d at 1356 & n.34; 38 C.J.S. *Garnishment* § 120 (2020) ("Generally, in garnishment proceedings, an insured's judgment creditor may only collect from the insurer if the insured could have enforced the policy."); *cf. Med. Mut. Liab. Ins. Soc. of Md. v. Davis*, 883 A.2d 158, 161-62 (Md. 2005) (same, analyzing Maryland law).  Thus, attachment reaches only the debtor's

property held by the garnishee at the time the writ is served. *See Smith*, 644 A.2d at 1356. A post-judgment writ of attachment will issue even though a trial court "has not previously decided the ownership of the asset in question, given that ownership of the property could promptly be questioned in any case involving a third party." *Brighthaupt*, 122 A.3d at 942 (discussing the implications of a writ of attachment as applied to assets that were fraudulently conveyed to a third party).

Following service of the writ on the garnishee and receipt of a garnishee's answers to the interrogatories accompanying the writ, the judgment creditor may obtain the judgment debtor's property held by the garnishee by requesting condemnation by the trial court. *See Smith*, 644 A.2d at 1352; Super. Ct. Civ. R. 69-I(e). This process also allows the garnishee to contest the judgment debtor's ownership of the property, and it allows the garnishee to defend against the attachment by filing an answer. *See Brighthaupt*, 122 A.3d at 942 (citing D.C. Code § 16-551 (2012 Repl.)); Super. Ct. Civ. R. 69-I(d). In reviewing the trial court's exercise of its discretion in granting a motion for judgment of condemnation, a "critical factor" for this court to consider is "whether the garnishee was in fact indebted to the judgment debtor or possessed any property belonging to the debtor." *Wrecking Corp. of Am., Va., Inc. v. Jersey Welding Supply, Inc.*, 463 A.2d 678, 680 (D.C. 1983).

"The decision to enter a judgment of condemnation, however, lies in the discretion of the trial court, and is therefore reviewable for abuse of that discretion." *Id.* (citations omitted).[17]

## B.  Insurance Policies

Nationwide argues that the Estate is prohibited from using a writ of attachment to obtain the Asals' insurance proceeds because the Policy's benefits are not the Asals' property.  We disagree.  We affirm here what has already been implied by our prior decisions:  as a general matter, the benefits of an insured's insurance policy can be garnished through a writ of attachment.  *See Peterson v. Gov't Emps. Ins. Co.*, 434 A.2d 1389, 1391 (D.C. 1981); *Coleman v. Aetna Ins. Co*, 309 A.2d 306, 307 (D.C. 1973).

When a party has been found liable for personal injuries arising out of an auto collision, this court has not questioned the validity of a writ of attachment to seek

---

[17] Although Nationwide argues that a de novo standard of review applies (pointing to cases not applicable to the writ of attachment or garnishment context), *Wrecking Corporation of America* held unequivocally that this court reviews a trial court's decision to enter a judgment of condemnation for abuse of discretion.  463 A.2d at 680.

the benefits of that party's insurance policy. For example, in *Peterson*, a pedestrian-vehicle collision case, the plaintiffs obtained a judgment in a suit for injuries, and they subsequently secured a writ of attachment against the driver's automobile insurance policy carrier (GEICO) "alleging indebtedness for the amount of the judgment under [the] automobile liability insurance policy." 434 A.2d. at 1389. In the garnishment action, this court reversed the trial court's grant of a motion for directed verdict in favor of GEICO, holding that the plaintiffs made out a *prima facie* case of the insurer's liability, which was not defeated by the plaintiffs' failure to introduce the insurance policy itself into evidence. *Id.* at 1389-91.[18] Implicit in that holding is that the judgment creditors (the pedestrians) were permitted to use a writ of attachment to garnish the benefits of the insurance policy owned by the judgment

---

[18] The court found that the plaintiff proved a prima facie case of GEICO's liability under the insurance policy because the facts demonstrated:

> (1) that GEICO issued an automobile liability insurance policy to [the defendant-driver]; (2) that the policy was in effect at the time of the automobile collision; (3) that GEICO assigned a claim number to the incident and undertook the defense of the insured in the Superior Court; and (4) that the judgment entered against the insured was within the liability limits of the insurance policy's coverage. Appellant also proved the judgment against the insured.

*Peterson*, 434 A.2d. at 1390-91.

debtor (the driver).  Similarly, in *Coleman*, a contested garnishment, this court did not question that the appellant-pedestrian had filed "a writ of attachment . . . against credits of the defendants [bus driver and his employer, who had struck them,] in the hands of . . . Aetna Insurance Co. (Aetna-garnishee), their insurer," 309 A.2d at 307, though it affirmed the trial court's judgment in favor of the insurer on other grounds.[19]  *Id.* at 308.

We find *Peninsula Insurance Co. v. Houser*, 238 A.2d 95 (Md. 1968), relied upon by the trial court, to be particularly persuasive.  In *Houser*, the plaintiff-passenger, who was injured in an auto collision and obtained a judgment against the driver, brought a writ of attachment against the driver's insurer and won a judgment of condemnation.  *Id.* at 96-97.  The Maryland Court of Appeals affirmed that a writ of attachment was the proper mechanism for the plaintiff-passenger to garnish the benefits of the driver's insurance policy.  *Id.* at 97-98.  The court noted that "[a] respectable majority of jurisdictions permit garnishment of an insurer by an injured person to compel payment of his judgment."  *Id.* at 97 (citing Appleman, Insurance

---

[19] The court held that the defendants (insured by Aetna) breached the cooperation clause of the insurance policy by failing to appear at a deposition and at trial; therefore, Aetna could deny coverage under the policy, defeating the garnishment claim.  *Coleman*, 309 A.2d. at 308.

Law and Practice § 4838 & n.34 (1942), and Restatement of Judgments § 111 cmt b

(1942)). In an attachment case, the "general rule" is:

> [T]he right of the attaching creditor to recover against the garnishee depends upon the subsisting rights between the garnishee and the debtor in the attachment, and the test of the garnishee's liability is that he has funds, property, or credits in his hands belonging to the debtor for which the latter would have the right to sue; the [creditor] is subrogated, as against the garnishee, to the rights of the debtor, and can recover only by the same right and to the same extent as the debtor might recover if he were suing the garnishee. In other words, the [judgment creditor's] right to recover under the attachment in this case depends upon and is controlled by the question of whether or not her judgment debtor . . . could successfully maintain a suit against the [garnishee].

*Id.* at 98 (quoting *U.S. Fid. & Guaranty Co. v. Williams*, 129 A. 660, 664 (Md.

1925)).

Here, Nationwide argues that the benefits of an insurance policy are not goods,

chattel, or credits that are subject to a post-judgment writ of attachment. Nationwide

contends that *Houser* is inapplicable because it interprets the Maryland rules

regarding garnishment, "which are broader than the District of Columbia's statute

governing" garnishment. The only distinction identified by Nationwide is that the

Maryland statute expressly permits "the attachment of credits that have not matured,

while District of Columbia does not." The *Houser* decision, however, did not turn

on whether the benefits of an insurance policy were attachable as an "unmatured credit" (such that they may fall within Maryland's attachment statute and not the District's). Rather, the court in *Houser* stated that attachment was the proper mechanism because the judgment creditor's "right to recover under the attachment in this case depends upon and is controlled by the question of whether or not her judgment debtor, [the insured], could successfully maintain a suit against the [garnishee, the insurer]." 238 A.2d at 98 (quoting *Williams*, 129 A. at 664 (quotation marks omitted)).[20]

Consistent with *Peterson*, *Coleman*, and *Houser*, we hold that the benefits of an insurance policy may be garnished through a writ of attachment. Upon entry of

---

[20] Moreover, we are unconvinced by Nationwide's attempt to distinguish between the law of the District and Maryland. It is true that the language of the two statutes differ. *Compare* D.C. Code § 16-544 ("An attachment may be levied upon the judgment debtor's goods, chattels, and credits."), *with Houser*, 238 A.2d at 97 ("Md. Rule G45[a] provides that '(a)ny property, including a credit which has not matured * * * in the hands of another, may be attached'"); *and* Md. Code Ann., Cts. & Jud. Proc. § 3-305 (West 2020) ("An attachment may be issued against any property or credit, matured or unmatured, which belong to a debtor."). Under Maryland law, "matured debt" refers to a sum that is certain and due, while "unmatured debt" refers to property or credit in which the sum is certain, but the time for payment has not yet occurred. *Consol. Const. Servs., Inc. v. Simpson*, 813 A.2d 260, 269 (Md. 2002). This court has held that a writ of attachment "will reach sums which the garnishee unconditionally owes to the debtor at the time the writ is served but which the garnishee has not yet posted to the debtor's account." *Smith*, 644 A.2d at 1356 n.34. Thus, it appears that the District's attachment statute also reaches an amount that is clearly due, though on a date that has not yet occurred – similar to the unmatured credits identified in Maryland's statute.

judgment against an insured party, the insured party's status changes to that of judgment debtor and its insurer's status changes to that of garnishee, such that the benefits of the insurance policy may be eligible for attachment and garnishment. Therefore, the prevailing party, i.e., the judgment creditor, is entitled to recover with an attachment to the same extent to which the judgment debtor could maintain a suit against the garnishee.

Other authorities support our conclusion that the benefits of an insurance policy are subject to a writ of attachment and garnishment. *See* 38 C.J.S. *Garnishment* § 120 ("The general rules as to the garnishability of property have been applied to various types of insurance policies."); 6 Am. Jur. 2d *Attachment & Garnishment* § 135 (2020) ("As a general rule, the right of an insured against an insurance company under a policy of insurance on property is subject to attachment or garnishment at the suit of creditors of the insured . . . ."); *id.* § 134 (2020) ("A traditional garnishment . . . against an insurer . . . assists in the recovery of an existing judgment. The only question in a traditional garnishment is whether the insurer-garnishee furnished coverage under the insurance policy. If so, a garnisher may garnish that coverage to pay for the underlying judgment already determined in a separate proceeding." (footnotes omitted)).

Here, we conclude that Nationwide sits in the same position as Peninsula Insurance in *Houser*, in that Nationwide indemnified the Asals against liability: it agreed to "pay damages for bodily injury . . . for which [the Asals] became legally responsible because of an auto accident." Upon the trial court's entry of judgment on November 15, 2017, the Asals became legally responsible to the Estate because of an auto accident; thus, the Estate became a judgment creditor under the Policy and was entitled to recover under the Policy by the same right and to the same extent as the Asals. Therefore, the Estate was entitled to use a writ of attachment to garnish the benefits of the Asals' Policy with Nationwide.

## C.    Cooperation Clause

Nationwide also argues that the proceeds of the Policy were not due and owing to the Asals, and therefore not attachable, because the Asals have not yet fully complied with the terms of the Policy's cooperation clause – and, in fact, cannot fully comply until the entirety of this litigation has run its course. We disagree, and we find no authority to support Nationwide's position.

Contractual rights that become due only upon the passage of time or upon the happening of a certain condition, i.e., contingent debts, are not subject to

garnishment.  *See Shpritz v. District of Columbia*, 393 A.2d 68, 70 (D.C. 1978);

*Cummings Gen. Tire Co. v. Volpe Const. Co.*, 230 A.2d 712, 713 (D.C. Cir. 1967)

("The rule is well settled that money payable upon a contingency or condition is not

subject to garnishment until the contingency has happened or the condition has been

fulfilled." (citation omitted)).  But such a contingency must be understood in context:

> The possibility that a future state of things may arise before the day of payment which will create a defense against the recovery of the debt, which circumstances, however, may never arise, does not render the debt contingent. Thus, a debt is due and garnishable even though it potentially may be defeated by a condition subsequent, whereas a debt is not garnishable where it does not arise until the occurrence of a condition precedent.

38 C.J.S. *Garnishment* § 101 (2020).  This court has consistently held that, under the

District's law, failure to comply with a non-cooperation clause acts as an affirmative

defense to garnishment.  *See, e.g.*, *Nationwide Mut. Ins. Co. v. Burka*, 134 A.2d 89,

91 (D.C. 1957) ("The defense of lack of cooperation is an affirmative one and [an]

insurer in asserting it has the burden of proceeding.").  As such, an insured's breach

of a non-cooperation clause operates as a defense against garnishment, enabling an

insurer to deny coverage under its policy.  *See Peterson*, 434 A.2d at 1391

("However, once the plaintiff proves a prima facie case, or the defendant admits all

the facts necessary to establish the case, the burden shifts to the defendant to prove

affirmative defenses such as forfeiture of the policy or breach of some contract

provisions by the plaintiff."); *Coleman*, 309 A.2d at 308 (affirming denial of coverage under insurance policy in garnishment action because insurer proved that insured breached cooperation clause).

In *Nationwide Mutual Insurance Co. v. Thomas*, 306 F.2d 767, 769 (D.C. Cir. 1962) (per curiam), the court affirmed that Nationwide Mutual Insurance was required to pay the benefits of an insured's policy to a judgment creditor in a garnishment proceeding, for the reasons stated by the trial court. The trial court began with the premise that the plaintiffs "may only recover from Nationwide, the garnishee, if [the defendant-policyholder] can recover from Nationwide, as they – the plaintiffs – stand in the shoes of the policyholder and enjoy no better rights than he does." *Thomas v. Otis*, 199 F. Supp. 1, 3 (D.D.C 1961), *aff'd sub nom. Nationwide Mut. Ins. Co. v. Thomas*, 306 F.2d 767 (D.C. Cir. 1962) (per curiam). The trial court reasoned that the defendant's "violation in a substantial manner" of the insurance policy's cooperation clause may "be prejudicial in effect to the insurer" such that it "relieves the latter of all liability." 199 F. Supp. at 3. While the court concluded that the defendant had indeed violated the cooperation

clause, it ruled that Nationwide had waived the defense by appealing the judgment on its merits without reserving any rights to the defense. *Id.* at 3-4.[21]

Pursuant to Part E of the Policy, Nationwide may deny coverage "if failure to comply with the [cooperation clause] is prejudicial to [it]." Thus, the cooperation clause may bar the Estate from recovering the benefits of the Asals' Policy if Nationwide can prove that the Asals breached the Policy's cooperation clause in a

---

[21] It may be that a choice-of-law analysis requires that this question be answered by application of Virginia law. Nationwide delivered the Policy to the Asals in Virginia for a vehicle they owned in Virginia, and therefore Virginia law may govern interpretations of the Policy. *See Vaughn v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200-04 (D.C. 1997) (applying Maryland law – pursuant to the District's choice-of-law analysis – to interpret benefits of automobile liability policy that covered vehicle and policyholder residing in Maryland, even though the underlying collision occurred in the District). In such a circumstance, however, we find Virginia law to be consistent with that of the District.

Under Virginia law, an insurer bears the burden of establishing "the affirmative defense of non-cooperation," and the insurer must prove that the failure to cooperate *"prejudiced the insurer in the defense of an action for damages arising from the insured's operation of a motor vehicle." State Farm Mut. Auto. Ins. Co. v. Porter*, 272 S.E.2d 196, 199 (Va. 1980); *see also Erie Ins. Exch. v. Meeks*, 288 S.E.2d 454, 456-57 (Va. 1982); *RML Corp. v. Assurance Co. of Am.*, 60 Va. Cir. 269, 2002 WL 32075213, at *2 (Va. Cir. Ct. Oct. 25, 2002). Thus, as under District of Columbia law, Virginia law recognizes non-cooperation as an affirmative defense. By contrast, Virginia courts have characterized other types of contract provisions – including "giving of notice of the accident," "giving of notice of suit," and "forwarding of suit papers" – as "conditions precedent" to coverage under a policy, requiring substantial compliance by the insured prior to triggering the insurer's obligation to defend. *Meeks*, 288 S.E.2d at 456-57.

way that was prejudicial to Nationwide. The cooperation clause is not a condition precedent that requires compliance prior to filing a writ of attachment to garnish the Policy's benefits; rather, it serves as a mechanism for Nationwide to affirmatively defend against liability. Moreover, Nationwide must establish prejudice. We find no merit to Nationwide's argument that the Policy's benefits can only be attached once Nationwide is able to assess the Asals' cooperation at the end of the underlying suit, after any and all appeals have run their course. Here, Nationwide has neither alleged nor provided evidence of any alleged non-cooperation by the Asals, let alone any prejudice stemming from that non-cooperation. Therefore, Nationwide failed to plead an affirmative defense that would establish a bar to the Estate's recovery pursuant to the judgment of condemnation.[22]

Because the record is devoid of any evidence of the Asals' non-cooperation that prejudiced Nationwide, we find no abuse of discretion by the trial court in ruling in favor of the Estate on its garnishment claim.

---

[22] Nationwide also argues that Part F of the Policy, prohibiting the Asals from bringing any legal action against Nationwide "until there has been full compliance with all the terms," prohibits the Estate from garnishing the Policy's benefits. They argue that at the time the Estate served the writ, "the Asals could not maintain an action against Nationwide, because the ongoing litigation precluded full compliance with the terms of the Asals' policy." This argument fails for the same reasons discussed above.

## VI.    Conclusion

For the reasons discussed, the trial court's judgment is hereby affirmed.

*So ordered.*

THOMPSON, *Associate Judge*, dissenting in part:    As described in the opinion for the court, at the close of the defense case in this matter, the trial court announced that it would not give a contributory negligence instruction and then directed a verdict in favor of the plaintiff Estate, reasoning that a pedestrian "has a right to assume that the vehicle . . . is going to stop because that's the law."  Defendants/appellants, the Asals, contend that the trial court erred in failing to submit to the jury the issue of decedent George Mina's contributory negligence.  I agree that this was an issue for the jury.  I respectfully dissent from the majority opinion insofar as it holds that no reasonable juror could have concluded that Mr. Mina was contributorily negligent.

The majority opinion acknowledges that the law in our jurisdiction is that a pedestrian "has a duty to exercise reasonable care for the protection of his or her own safety[,]" *Lyons*, 667 A.2d at 322, even when the pedestrian has the right-of-way, which Mr. Mina indisputably had when he crossed Wisconsin Avenue in the

crosswalk at its unsignaled intersection with Veazey Street. *Supra* at 3. My colleagues in the majority also say that they "reject" the Estate's argument that a pedestrian, once legally crossing within the crosswalk, has "no duty to continually observe for traffic which was legally required to stop in advance of the crosswalk." *Supra* at 16. They nevertheless conclude that the trial court did not err in directing a verdict in favor of Mr. Mina's Estate. They do so even though it is undisputed (and the jury could have found from the video evidence) that Mr. Mina turned his head away from oncoming traffic in the innermost northbound traffic lane he was about to cross, and looked instead toward traffic approaching in the more distant southbound lanes.

The court arrives at its conclusion in part by relying on D.C. Code § 50-2201.28(a-1), which requires a driver to stop whenever he or she approaches in an adjacent lane, or from behind, another vehicle that is stopped "at a marked crosswalk at an unsignalized intersection," and which thereby gives the right-of-way to pedestrians. The court concludes that this provision, which is implicated by the situation Mr. Asal faced as he approached the intersection involved here,[23] "informs

---

[23] Mr. Asal testified, however, that from his "low" vehicle he did not see Mr. Mina or any pedestrian in the intersection, and further testified that he thought at the time that the vehicle in the lane to his right (driven by a Ms. Rigney) was slowing to execute a right turn rather than stopped to allow a pedestrian to cross (though he acknowledged that video footage shows that Ms. Rigney's car had in fact stopped).

whether [a pedestrian's] conduct [in a particular case] is reasonable." The court also relies on the "general proposition" that a pedestrian in a crosswalk may rely on the expectation of lawful conduct by drivers and need not anticipate or act in such a way that assumes wrongful conduct of others. *Supra* at 17. For that proposition, the court relies on *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) ("[A] plaintiff is not bound to anticipate negligent conduct on the part of others[,]" but rather "may assume that others will fulfill their duties."), and *Griffith v. Slaybaugh*, 29 F.2d 437, 438 (D.C. Cir. 1928) (stating that a pedestrian with the right-of-way has a "right to presume that he can pass over in safety").

Notably, however, *Stager*, as well as the only other opinion I have been able to find from our jurisdiction that articulates the proposition about "assum[ing] that others will fulfill their duties," involved the plaintiff's reliance on a professional to perform his or her professional obligations, rather than a pedestrian's reliance on a driver's adherence to traffic rules. The issue in *Stager* was whether a patient could rely on the radiologist who interpreted her pre-operative chest x-ray to inform her of the lung abnormality shown on the x-ray, or whether instead, in order not to be contributorily negligent, the patient had a duty to call and obtain the x-ray result. *Id.* at 1311. This court answered that the patient could rely on the radiologist, explaining first that "[a] reasonable person need not go through life timidly, seeking to guard

against that which is only remotely probable and not to be feared except by the overly cautious." *Id.* We refused to "transfer[] [the duty] from the health professional to the patient[,]" and we cited the "ordinar[y]" rule that "a patient can rely on a doctor's informing her if the results of a test are positive." *Id.* at 1311-12. We also noted that the patient, who had a family history of lung cancer, had previously had annual x-rays and "was always informed of the results of these x-rays[.]" *Id.* at 1311.

This court's reasoning was similar in *Bell v. Jones*, 523 A.2d 982 (D.C. 1986). In that case the plaintiff architect and his company had engaged a professional engineer/surveyor to prepare a plat showing the property lines of a plot on which plaintiffs planned to construct townhouses. *Id.* at 997. The issue was whether the plaintiffs could rely on the surveyor to show precise angle measurements on the plat. *Id.* We reasoned that the architect was not bound to anticipate negligence on the part of the professional surveyor, but could reasonably assume that the surveyor would fulfill his duties, including the duty to exercise reasonable care in certifying the angle measurements. *Id.* I do not believe that either *Bell* or *Stager*, with their focus on professional duty, is helpful in resolving the present case.

As noted, the majority opinion also cites the D.C. Circuit's 1928 opinion in *Griffith* for what my colleagues refer to as its "clear expression of the law" regarding

pedestrian right-of-way: that "the one first entering [a street intersection] has the right to presume that he can pass over in safety and is not required to exercise continuous and extra observation to avoid vehicles using such street." *Griffith*, 29 F.2d at 438 (quoting *Riddel v. Lyon*, 213 P. 487, 489 (Wash. 1923)).[24] Actually, the *Griffith* court referred to the rule it articulated as "a clear expression of the law as announced in many cases touching the right of way of pedestrians *at crossings controlled either by a traffic officer or signals*." 29 F.2d at 438 (italics added). *Griffith* itself involved a signalized crosswalk under the direction of a traffic officer and addressed the issue of whether the pedestrian had a right-of-way to complete his street crossing once the signal changed. *See* 29 F.2d at 439. The facts of *Riddel*, the

---

[24] Of the D.C. Circuit opinions cited in the majority opinion, *Griffith* appears to be the only one that applied an unqualified "general proposition" about a pedestrian's entitlement to assume that drivers will obey the law in the situation it described. The other cited D.C. Circuit opinions did not do so. In *American Ice Co. v. Moorehead*, 66 F.2d 792 (D.C. Cir 1933), the D.C. Circuit approved an instruction that "in effect told the jury that, notwithstanding the obligation imposed by the traffic regulation upon the driver of an automobile to be watchful in avoiding injury to pedestrians lawfully using a street intersection, if the pedestrian was himself guilty of any act of negligence -- which the court was careful to tell the jury was the omission to do anything which a reasonable person, guided by those ordinary considerations which regulate human conduct, would do in the circumstances -- such act of negligence would defeat a recovery." *Id.* at 793-94. In *Miller v. Clark*, 109 F.2d 677 (D.C. Cir. 1940), the D.C. Circuit affirmed the trial court's denial of a motion for a directed verdict on the issue of a pedestrian's contributory negligence because "reasonable care did not *necessarily* require [the pedestrian], before or after entering the crosswalk, to look again up [the street] on the chance that a negligent driver might approach swiftly and without warning from around the corner." *Id.* at 678 (italics added).

1923 Supreme Court of Washington opinion on which *Griffith* relied, are remarkably similar. *See* 213 P. at 488. Neither *Griffith* nor *Riddel*, says anything about a pedestrian's duty to look out for traffic mid-crossing when (as was the case here) there is no traffic signal or traffic officer.[25] For these reasons, *Griffith* is not binding in the present case, and neither *Griffith* nor *Riddel* is apposite.

In addition, *Riddel* provides weak support at best for affirming the directed verdict in this case, because its persuasive force has been significantly diminished by several later rulings of the Washington Supreme Court. For example, in *Shasky v. Burden*, 470 P.2d 544 (Wash. 1970), the Supreme Court of Washington held that "there was substantial evidence requiring the court to submit to the jury the issue of plaintiff's contributory negligence" where the plaintiff pedestrian, who was struck by a vehicle in a crosswalk, had "walked rapidly with her head turned away from

---

[25] Moreover, as recognized in *Long v. Mercer*, 125 A.2d 685 (D.C. 1956), even with respect to a signalized crosswalk, *Griffith* did not foreclose a finding of pedestrian contributory negligence as a matter of law. *See* 125 A.2d at 686-87 (reasoning that although the pedestrian, who had not finished crossing at a signalized intersection when the traffic light "changed to red against her," had the right-of-way, "watchfulness in several directions was required of plaintiff for her own safety[,]" such that the trial court did not err in denying directed verdicts; stating that it was "rather plainly a question of fact" whether the plaintiff pedestrian's negligence was a contributing factor to the accident).

oncoming traffic and made no attempt whatever to see if any vehicles were approaching the crosswalk on that dark, rainy night." *Id.* at 547. The court stated,

> Strong as the protection afforded by the crosswalk may be and however unlikely that a pedestrian struck in a crosswalk would be contributorily negligent, there nevertheless remains in the law a legal possibility that a pedestrian, . . . struck by a vehicle while in a marked crosswalk, may have been contributorily negligent. If there is evidence to support the issue, the court must submit the issue of contributory negligence to the jury.

*Id.* at 548. Similarly, in *Oberlander v. Cox*, 449 P.2d 388 (Wash. 1969), the Washington court considered the evidence that the plaintiff pedestrian, crossing the street during a storm and driving rain, "walked rapidly, but, having looked once, did not look either way again until she was struck by defendants' car." 449 P.2d at 389. The court held that the evidence "suppl[ied] some substantial evidence from which a jury could infer contributory negligence[,]" such that the issue should go to the jury. *Id.* at 391; *see also Clements v. Blue Cross of Wash. & Alaska*, *Inc.* 682 P.2d 942, 948 (Wash. 1984) ("There was substantial evidence presented to support defendants' position that Clements should have known to look for oncoming traffic even though she was legally in the crosswalk. It was error to refuse to instruct the jury on contributory negligence and [instead] to direct a verdict on liability.").

The law as it has evolved in Washington State after *Riddel* appears to state "[t]he generally accepted" and "quite universal" rule: "that a pedestrian's failure to keep a constant lookout, or to look again after having determined that he can safely cross ahead of approaching traffic, is not contributory negligence as a matter of law but it is a question for a jury whether he was in the exercise of ordinary care for his own safety." *Moran v. Gatz*, 62 N.E.2d 443, 446 (Ill. 1945) (collecting cases).

In the present case, my colleagues in the majority conclude that there was no legally sufficient evidentiary basis for a reasonable jury to find that Mr. Mina was contributorily negligent. I conclude to the contrary that there was sufficient evidence in this case for the issue of contributory negligence to be "one for the jury." *Id.*

First, it was undisputed that Mr. Mina worked in the same block (the 4200 block of Wisconsin Avenue) where the accident occurred. This suggests that he may have been familiar with the practices of drivers at the crosswalk, including whether they reliably stop for pedestrians in the crosswalk. Therefore, one piece of evidence that might have been notable to the jury is the evidence that, before beginning to cross the street, Mr. Mina looked to his left and made eye contact with Ms. Rigney, who brought her car to a stop in the traffic lane closest to him, *and only thereafter proceeded to cross*. This was "some evidence" from which the jury could infer that

Mr. Mina understood that vehicles approaching the intersection might not stop for him despite their legal duty to do so.[26] *Abebe v. Benitez*, 667 A.2d 834, 836 (D.C. 1995) (per curiam) ("As long as there is some evidence from which jurors could find that the party has met its burden, a trial judge must not grant a directed verdict.").

Second, Mr. Asal testified that he knew the area near the intersection well because he passed through it every day driving to his job at a restaurant located approximately four blocks away. He further testified that, in his experience, many cars make a right turn at the intersection in question in order to park in the rear of a restaurant located there. He testified that most drivers "make a right [turn] from the middle [northbound] lane" because there is usually a "bus stop[ping at the bus stop] or a bike" in the right lane. Mr. Asal also told the jury that he thought that Ms. Rigney's car was slowing to turn, and that her car "blocked his view of the pedestrian." Had jurors credited Mr. Asal's testimony about practices at the intersection in question, that might have influenced their determination about whether Mr. Mina "should have known" of a need for "increased vigilance" at the Veazey Street crosswalk, and about whether he breached his duty to exercise such vigilance by looking away from the traffic in the innermost northbound lane as he

---

[26] *See* D.C. Code § 50-2201.28(a) ("The driver of a vehicle shall stop and remain stopped to allow a pedestrian to cross within any marked crosswalk . . . .").

was about to cross that lane. *Clements*, 682 P.2d at 948.

Third, jurors could have evaluated the foregoing evidence in light of their experience. A *Washington Post* article from October 1988 reported that during an hour-long observation period, "[n]ot one car" stopped at the crosswalk at 16th and Fuller Streets, N.W., to let pedestrians cross. It further reported that "[t]his familiar routine occurs daily around the District[.]"[27] An article and video posted online nearly thirty years later (in 2016) suggest that the problem may have persisted around the time of the incident involved in this case: the video captured what happened when a police officer posing as a pedestrian tried to cross 14th Street near U Street, N.W. The article reported that when a black car approached the officer standing in the crosswalk, the black car "bl[e]w past him."[28] Jurors may have had their own experiences with or knowledge of similar occurrences, perhaps causing them to understand that, in the District of Columbia, incidents of drivers not stopping at

---

[27] See Kristin Eddy, *PEDESTRIANS BEWARE D.C. DRIVERS FAIL TO YIELD TO CROSSWALKS, LAW*, The Washington Post (Oct. 11, 1988), https://www.washingtonpost.com/archive/local/1988/10/11/pedestrians-beware-dc-drivers-fail-to-yield-to-crosswalks-law/ae0925ad-d741-40e4-a451-05a7fb8a69a3/ https://perma.cc/LUR9-G9L5 (last visited March 12, 2021).

[28] See Dan Taylor, *Here's Why It's a Bad Idea to Blow Through a Crosswalk in DC [VIDEO]*, Crime & Safety (Apr. 26, 2016, 4:03 PM), https://patch.com/district-columbia/washingtondc/heres-why-its-bad-idea-blow-through-crosswalk-dc-video https://perma.cc/SDC6-EQME (last visited March 12, 2021).

crosswalks to yield the right of way to pedestrians may be expected. Such incidents are not merely "remotely probable[,]" *Stager*, 494 A.2d at 1311, and jurors' experience and knowledge regarding the same might have informed their judgment as to whether Mr. Mina acted reasonably in assuming, contrary to (possible) common experience, that any vehicle in the innermost northbound lane would stop at the crosswalk just because its driver saw the vehicle in the adjacent lane slowing to a stop. This discussion shows why it was a jury question whether Mr. Mina's looking away from oncoming traffic in the lane he was about to cross satisfied his obligation to exercise reasonable care for the protection of his safety. Jurors might reasonably have disagreed with the reasoning of my colleagues that once Mr. Mina confirmed that Ms. Rigney had stopped, he could "reasonably assume that other cars driving northbound in the other lanes would . . . stop to allow him to pass, as required by § 50-2201.28(a-1)."[29] *Supra* at 31.

To be clear, I agree that Mr. Asal had a legal duty to stop regardless of any assumption that the vehicle to his right (Ms. Rigney's car) was stopping or slowing

---

[29] *Cf. Wood v. Bellingham*, 813 P.2d 142, 145-46 (Wash. Ct. App. 1991) (reasoning that where the plaintiff pedestrian, who failed to make eye contact with the driver who subsequently hit her, "exercised her right of way as if it were absolute[,]" "a jury could reasonably conclude that [her] action in assuming the vehicle had stopped for her and proceeding to cross . . . without heeding the driver's apparent inattention constituted a failure to exercise due care[,]" and thus that "the trial court did not err in submitting the issue to the jury").

to execute a turn; the consequence of his failure to do so was tragic and is horrific to watch on the surveillance video that captured the accident. But the evidence and considerations I have described are relevant to whether Mr. Mina exercised reasonable care for the protection of his safety by omitting to do something "which a reasonable person, guided by those ordinary considerations which regulate human conduct, would do in the circumstances." *American Ice Co.*, 66 F.2d at 793-94. The issue "was for consideration by the factfinder." *Lyons*, 667 A.2d at 323.